**NATIONAL ORGANIZATION FOR WOMEN, INC., and its women members and other women who use or may use the services of women's health centers that provide abortions; Delaware Women's Health Organization, Inc., and Summit Women's Health Organization, Inc., on behalf of themselves and all other similarly-situated clinics, Plaintiffs,**

**v.**

**Joseph M. SCHEIDLER; Pro–Life Action League, Inc.; Randall A. Terry; Andrew Scholberg; Conrad Wojnar; Timothy Murphy; Monica Migliorino; Vital–Med Laboratories, Inc.; Project Life; and Operation Rescue, Defendants.**

**No. 86 C 7888.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 25, 1995.

Fay Clayton, Susan Valentine, Judi A. Lamble, Sara N. Love, Robinson Curley & Clayton, P.C., Chicago, IL, Patricia Ireland, National Organization for Women, Inc., Washington, DC, Jack L. Block, Angela Im, Sachnoff & Weaver, Ltd., Chicago, IL, Miriam G. Bahcall, Rawn H. Reinhard, Dayla Khan, Skadden Arps Slate Meagher & Flom, Chicago, IL, Alan M. Pollack, Pollack & Greene, New York City, for plaintiffs.

Thomas L. Brejcha, Abramson & Fox, Robert S. Harib, Chicago, IL, for defendants Joseph M. Scheidler, Timothy Murphy, Andrew Scholberg, and the Pro–Life Action League.

Lawrence M. Gavin, Bell Boyd & Lloyd, Chicago, IL, Jay Alan Sekulow, Walter M. Weber, American Center for Law & Justice, Washington, DC, Larry L. Crain, Brentwood, TN, Benjamin W. Bull, American Center for

**1054**

Law & Justice, Phoenix, AZ, for defendants Randall A. Terry, Project Life and Operation Rescue.

Charles F. Redden, Mark D. Roth, Pretzel & Stouffer, Chtd., Chicago, IL, for defendant Vital–Med Laboratories.

Craig Parshall, The Rutherford Institute, Fredricksburg, VA, Philip King, Tribler &

Orpett, Chicago, IL, for defendant Monica Migliorino.

Jennifer C. Neubauer, Lake Forest, IL, for defendant Conrad Wojnar.

***MEMORANDUM OPINION AND ORDER***

COAR, District Judge.

## INDEX

Background........................................................1054
I. Res Judicata ....................................................1056
 A. Legal Standard for Res Judicata ...........................1057
 B. Applicability of Res Judicata to the Parties...............1057
 1. NOW....................................................1057
 2. Wojnar ................................................1060
 a. Identity of the Parties ..........................1060
 b. Identity of Causes of Action .....................1060
 c. Final Judgment on the Merits .....................1060
II. Supplemental, Ancillary, or Pendent Jurisdiction Over Vital–Med .............1061
 A. Applicability of 28 U.S.C. § 1367 .........................1062
 B. History of Supplemental Jurisdiction ......................1062
 1. Application to Vital–Med ..............................1063
 2. Application to Wojnar..................................1064
III. Failure to State A Claim......................................1064
 A. Proximate Cause and Standing ..............................1065
 1. Standing...............................................1065
 a. DWHO & Summit ....................................1065
 b. NOW ...............................................1067
 2. Requirement of Predicate Act as Proximate Cause ......1070
 B. Pleading Deficiencies......................................1072
 1. Hobbs Act Pled—Mandated Issue.........................1072
 2. Pleading a RICO Conspiracy ...........................1074
 3. Other Predicate Acts .................................1078
 a. Travel Act and State Law Extortion as Predicate Acts ..........1078
 b. Theft of Fetal Remains as Predicate Act ..........1080
 C. Availability of Injunctive Relief .........................1081
IV. First Amendment Concerns.......................................1083
 A. Freedom of Speech .........................................1083
V. Constitutionality of RICO .....................................1089
 A. Vagueness .................................................1089
 B. Overbreadth...............................................1089
VI. Conclusion ....................................................1091

### Background

This nine-year-old case has a long and convoluted history, portions of which must be reviewed in order to understand the issues before the court. For a more detailed exposition of the facts and procedural history of this case, please refer to *NOW v. Scheidler,* — U.S. ——, 113 S.Ct. 2958, 125 L.Ed.2d 659 (1993).

In 1986, plaintiffs National Organization for Women ("NOW"), and two women's health centers brought this action against various anti-abortion activists, anti-abortion organizations, and a pathology testing laboratory. They alleged that defendants conspired to drive out of business health centers that provide abortion services. Plaintiffs contended that defendants committed extortion, engaged in physical and verbal intimidation, destroyed property, orchestrated phone campaigns to tie up clinic phone lines, made false appointments at the clinics, and disrupted the clinics' relationship with their landlords—all in violation of the Sherman

Antitrust Act and sections 1962(a), (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs also raised several pendent state claims.

On May 28, 1991, the district court dismissed the Second Amended Complaint. *NOW v. Scheidler*, 765 F.Supp. 937 (N.D.Ill. 1991). The court held the Sherman Act inapplicable to the conduct alleged in the complaint because defendants' conduct was incidental to a valid effort to influence governmental action and therefore immune. The court dismissed the § 1962(a) RICO claim because defendants' receipt of donations from supporters was not income derived from racketeering. The § 1962(c) RICO claim was dismissed because the court concluded that RICO requires that economic motive be alleged. The RICO conspiracy count was dismissed because all substantive RICO counts failed. The state law claims were also dismissed because the dismissal of the claims based on federal law destroyed the basis for jurisdiction over the state law claims. The plaintiffs appealed.

On June 29, 1992, the Court of Appeals for the Seventh Circuit affirmed the district court's dismissal. *NOW v. Scheidler*, 968 F.2d 612 (7th Cir.1992). The plaintiffs sought and obtained a writ of certiorari from the United States Supreme Court limited to the question of whether a RICO violation required motivation by an economic purpose. *NOW v. Scheidler*, —— U.S. ——, 113 S.Ct. 2958, 125 L.Ed.2d 659 (1993).

On January 24, 1994, the Supreme Court reversed. *NOW v. Scheidler*, —— U.S. ——, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). The Court held that RICO does not require proof that either the alleged racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose. In a concurring opinion, Justice Souter emphasized that although the First Amendment does not require reading an economic motive into the unambiguous RICO statute, legitimate free speech issues may be implicated in this case. Justice Souter advised that those concerns should be addressed as they arise. The defendants petitioned for a rehearing, which was denied on March 21, 1994. *NOW*

*v. Scheidler*, —— U.S. ——, 114 S.Ct. 1340, 127 L.Ed.2d 688 (1994).

On October 3, 1994, in an unpublished opinion, the Seventh Circuit recapitulated the Supreme Court's opinion. The Court of Appeals directed the district court to address the issue of whether the predicate acts alleged in the complaint in fact violated the Hobbs Act (18 U.S.C. § 1951). The court specifically reaffirmed its original dismissal of the Sherman Act count and RICO § 1962(a). The court further stated:

> The Supreme Court's decision reinstated count 3 (RICO § 1962(c)) and count 4 (RICO § 1962(d)). Counts five, six, and seven, which allege violations of state law, survive as well pursuant to the district court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

> Also on remand, if necessary, the district court should consider which of the defendants' activities, as alleged, are protected by the First Amendment to the United States Constitution. *See Scheidler*, —— U.S. at —— n. 6, 114 S.Ct. at 806 n. 6. As Justice Souter pointed out in his concurring opinion, "even in a case where a RICO violation has been validly established, the First Amendment may limit the relief that can be granted against an organization otherwise engaging in protected expression." *Id.* at ——, 114 S.Ct. at 807 (Souter, J., concurring). This includes Hobbs Act extortion—the sole RICO predicate act alleged by plaintiffs in both their complaint and their RICO Case Statement.

*NOW v. Scheidler*, 25 F.3d 1053, 1994 WL 196761 **2 (7th Cir.1994). The case was remanded to the district court for further proceedings.

Before the district court could comply with the mandate of the Court of Appeals, the plaintiffs filed a motion for leave to file a third amended complaint. On October 21, 1994, Judge Holderman granted plaintiffs' motion and ordered plaintiffs to file an updated RICO case statement (Tr. p. 31). The Third Amended Complaint (hereinafter the "Complaint") has four counts.

Count I of the Complaint is brought by all plaintiffs[1] and alleges violations against all defendants except Vital–Med Laboratories, Inc. ("Vital–Med").[2] Count I also alleges that the defendants violated RICO by participating in the Pro–Life Action Network ("PLAN"), which the plaintiffs allege is an enterprise as defined by 18 U.S.C. § 1961(4). Several distinct predicate acts are alleged under count I. These acts include attempted arson, murder, and various Hobbs Act violations. Count II of the Complaint alleges that all defendants except Vital–Med conspired to violate the RICO Act. Count III is brought by DWHO and Summit and alleges that defendants Scheidler, Scholberg, Murphy, Migliorino, Wojnar, and PLAL tortiously interfered with the plaintiffs' prospective economic advantage. Count IV is brought by Summit alone and alleges that defendant Migliorino tortiously interfered with an existing business relationship between Summit and Summit's prospective lessor. Count V is brought by DWHO and Summit against only Vital–Med for breach of duty of confidentially.

This case was transferred to the undersigned by Executive Order dated November 8, 1994. On February 7, 1995, this court denied several sanctions motions and motions to reconsider the grant of leave to file a Third Amended Complaint. *NOW v. Scheidler,* 1995 WL 59228 (N.D.Ill.1995).

Defendants now move to dismiss the Third Amended Complaint. [Docket numbers 768, 774, 776, 784, 787]. All motions are fully briefed and ripe for decision. Although the Defendants have filed separate motions and replies, the motions raise similar, though not identical, issues. To the extent possible, the court will address the various Defendants' arguments together. However, several of the arguments do not lend themselves to one coherent treatment.[3]

## I. Res Judicata

Defendants make two res judicata arguments. First, they allege that NOW is barred from being a plaintiff under the Third Amended Complaint because it suffered a final dismissal of its claims under the Second Amended Complaint. Second, Wojnar argues that he has obtained a final dismissal of all claims alleged against him and, therefore, res judicata should protect him from having to further defend himself in this litigation.

■ Res judicata is a judicial doctrine designed to ensure the finality of judicial decisions. *Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979); *Car Carriers, Inc. et al. v. Ford Motor Co. et al.,* 789 F.2d 589, 593 (7th Cir.1986). It is a "rule of fundamental and substantial justice," *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148 (1917); *Car Carriers,* 789 F.2d at 593, whose enforcement is essential to the maintenance of social order, "for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if ... conclusiveness did not attend the judgments of such tribunals." *Alexander v. Chicago Park District,* 773 F.2d 850, 853 (7th Cir.1985) (*quoting Nevada v. United States,* 463 U.S. 110, 129, 103 S.Ct. 2906, 2917–18, 77 L.Ed.2d 509 (1983)).

---

1. The plaintiffs in this action are: NOW, on behalf of itself and its members and others who use or may use the services of women's health centers that provide abortions, the Delaware Women's Health Organization, Inc. ("DWHO"), and Summit Women's Health Organization, Inc. ("Summit"), on behalf of themselves and similarly situated clinics.

2. The other defendants in this action are Joseph Scheidler ("Scheidler"), the Pro–Life Action League ("PLAL"), Randall Terry ("Terry"), Andrew Scholberg ("Scholberg"), Conrad Wojnar ("Wojnar"), Timothy Murphy ("Murphy"), Monica Migliorino ("Migliorino"), Project Life, and Operation Rescue.

3. It appears that the Defendants have taken advantage of their status as co-defendants and allowed one group of defendants to "carry the torch" on each individual argument thereby saving the co-defendants' limited 15–page brief space for other arguments. To the extent possible, the court will identify the parties who concur or adopt their co-defendants' positions. However, this type identification is difficult, as some defendants have endorsed their co-defendants' arguments with a single sentence. The court has addressed all meritorious arguments made by the parties, and identifies the individual defendant proponents merely to ease the task of those who will undoubtedly review the record in the future.

■ Res judicata, also called claim preclusion, bars the same parties or their privies from relitigating any issue that was raised in a prior judgment or could have been raised in the prior action. *Alexander*, 773 F.2d at 853; *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 657 F.2d 939, 945 (7th Cir.1981); *see* Jack Friedenthal, Mary Kay Kane, Arthur Miller, *Civil Procedure* 610 (1993). As the Court of Appeals explained in *Alexander:*

> Preclusion occurs under two theories: issue preclusion and claim preclusion. Claim preclusion bars relitigation of claims or issues which were or could have been raised in a prior suit on the merits between the same parties or their privies. Plaintiffs' claims are merged in the judgment for plaintiff while judgment for defendants acts to bar any further claims by plaintiff against the defendant. It is usually referred to as res judicata.... Issue preclusion prevents relitigation of a matter of fact of law that was previously litigated and decided. *See Jones v. City of Alton*, 757 F.2d 878, 879 n. 1 (7th Cir.1985). It is usually referred to as collateral estoppel.

*Alexander*, 773 F.2d at 853.

Res judicata promotes accuracy (leaving in place properly decided cases), efficiency ("it is in the interest of the state that there be an end to litigation"), and fairness ("no person should be twice vexed by the same claim"). Friedenthal, et al., *Civil Procedure* 617 (1993), *see* Robert Ziff, Note, *For One Litigant's Sole Relief: Unforeseeable Preclusion and the Second Restatement*, 77 Cornell L.Rev. 905, 910 (1992).

### A. Legal Standard for Res Judicata

■ There are three threshold requirements to be considered in applying res judicata: (1) identity of the parties or their privies; (2) identity of the causes of action; and (3) a final judgment on the merits. *Car Carriers*, 789 F.2d at 595 n. 9; *Alexander*, 773 F.2d at 854; *Lee v. City of Peoria*, 685 F.2d 196, 199 (7th Cir.1982). A court must find each of these threshold requirements in order to apply res judicata as a bar.

■ The doctrine of res judicata is generally applied to a single "cause of action." The Court of Appeals in this circuit employs the "same transaction" test to define a "cause of action." *Car Carriers*, 789 F.2d at 593; *Alexander*, 773 F.2d at 854; *Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1241 (7th Cir.1983). Under the same transaction test, a "cause of action" consists of a " 'single core of operative facts' which would give rise to a remedy." *Car Carriers*, 789 F.2d at 593 (quoting *Alexander*, 773 F.2d at 854). The "same transaction" test is fact-oriented, and provides that once a transaction has caused injury, all claims arising from that transaction must be brought in the same suit or be lost. *Car Carriers*, 789 F.2d at 593.

### B. Applicability of Res Judicata to the Parties

#### 1. NOW

■ Defendants Terry, Project Life, and Operation Rescue (hereinafter the "Terry Defendants") and Defendants Scheidler, Scholberg, Murphy, and PLAL (hereinafter the "Scheidler Defendants") argue that res judicata bars NOW, and only NOW, from bringing RICO claims against them. The Terry Defendants argue that NOW suffered a final, undisturbed judgment when the Second Amended Complaint was dismissed. They argue that in the Second Amended Complaint, NOW claimed injury only under the Sherman Act and that the dismissal of the Sherman Act claims was undisturbed by the Supreme Court. Accordingly, the Terry Defendants claim that res judicata bars NOW from asserting a new claim arising from the same set of operative facts after a final decision on the merits of the original claim. Thus, they argue, under the "same transaction" test, NOW should be precluded from prosecuting the Third Amended Complaint.

The plaintiffs argue that NOW did allege RICO claims in the Second Amended Complaint, and that those claims remain viable after the Supreme Court's reversal of the prior orders of dismissal. Thus, the first task is to determine whether NOW was a plaintiff as to the RICO counts in the Second Amended Complaint. If the answer is yes and those counts were revived by the decision of the Supreme Court, res judicata is not applicable because there has been no final

decision on the merits. This determination is made difficult by the fact that not every named plaintiff made claims against every named defendant in the Second Amended Complaint.

Before turning to the specific language relied upon by the parties, a description of the layout of the Second Amended Complaint is helpful. Paragraphs one through three are contained in a subsection of the complaint titled "NATURE OF THE ACTION." Paragraph four deals with jurisdiction. Paragraphs five through eight are captioned "PLAINTIFFS." Paragraphs nine through twenty appear under a "DEFENDANTS" heading. Paragraphs twenty-one through thirty-seven describe "CLASS ALLEGATIONS." Paragraphs thirty-eight through fifty-five are captioned "FORMATION OF THE PRO–LIFE ACTION NETWORK." Paragraphs fifty-six through sixty-three explain the "CARRYING OUT OF PLAN'S AGENDA: OPERATION RESCUE." Paragraphs sixty-four through seventy-eight appear under a "THEFT OF FETAL REMAINS" caption. Paragraph seventy-nine is the beginning of the actual substantive counts of the complaint; each count realleging the facts contained in the previous paragraphs. Over half the allegations in the complaint are not contained within a "count." This makes interpretation of the complaint difficult because, as will become clear, the complaint contains both specific allegations brought by specific defendants *as well as*

general allegations which, read alone, do not always make clear which plaintiff is making the assertion.

In the first paragraphs under the RICO counts subheadings (counts II, III, and IV) the Second Amended Complaint states that the counts were brought by "plaintiffs DWHO and Summit and the class they represent." (Second Am.Compl. ¶¶ 94,[4] 106,[5] 111,[6]). NOW takes the position that paragraphs one, three, twenty-two, 105, and 110 of the Second Amended Complaint support its conclusion that it was a RICO plaintiff in the Second Amended Complaint.

Paragraph one[7] outlines the law to be used to justify the relief sought: to obtain declaratory and injunctive relief. Paragraph one thus logically encompasses both the alleged RICO violations and the alleged Sherman Act violations (because both such allegations are made later in the complaint under specific counts) by stating "this is a civil action pursuant to ... the Sherman Antitrust Act ... [and] ... RICO." Thus, paragraph one *does* identify NOW as a plaintiff, but not *necessarily* as a RICO plaintiff.

Paragraph three[8] is no more enlightening. This paragraph does not identify which count it refers to and does no more than explain that NOW believed it had organizational standing to sue under the Sherman Act (see *infra*). Nothing in the paragraph could be

---

4. Paragraph 94 alleges:

 Count II is brought against the defendants Scheidler, Terry, Scholberg, Murphy, PLAL, OR, and the Project (the "RICO Defendants") by plaintiffs DWHO and Summit and the class they represent, which reallege paragraphs 1 through 78.

5. Paragraph 106 provides:

 Count II is brought against the RICO Defendants and defendant Migliorino by plaintiffs DWHO and Summit and the class of clinics they represent, which reallege paragraphs 1 through 78, and 95 through 105.

6. Paragraph 111 alleges:

 Count IV is brought against the RICO defendants by plaintiffs DWHO and Summit and the class of clinics which they represent, which reallege paragraphs 1 through 78, 95 through 105, and 107 through 110 above.

7. Paragraph one provides:

 This is a civil action pursuant to section 16 of the Clayton Act, 15 U.S.C. Section 26, and section one of the Sherman Antitrust Act, 15 U.S.C. Section 1; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Section 1962; and state law. Plaintiffs seek declaratory and injunctive relief and damages from defendants who have conspired, among themselves and with others to drive women's health centers that perform abortions out of business through a pattern of concerted, unlawful activity.

8. Paragraph three states:

 The National Organization for Women ("NOW") sues on behalf of itself, its women members who use or may use the services of women's health centers that perform abortions, and other women who use or may use the services of such centers.

logically construed to support plaintiffs' allegation that NOW was a RICO plaintiff.

Paragraph twenty-two,[9] though lengthy, provides no additional support for the plaintiffs' position. The paragraph appears under a "Class Allegations" subdivision of the complaint and tracks the requirements of organizational standing. *See infra* at 31. Indeed, the paragraph states that NOW wishes to represent the class in order to obtain declaratory and injunctive relief. That form of equitable relief was only requested under the Sherman Act count of the Second Amended Complaint.

Paragraph 105[10] is part of count II which alleges violations of RICO section 1962(a). The section 1962(a) count of the Second Amended Complaint was not reinstated by the Seventh Circuit or the Supreme Court. Count II states that it is brought "by plaintiffs DWHO and Summit and the class they represent ..." (Second Am.Compl. ¶ 94). However, paragraph 105 does plainly state that "the RICO Defendants' activities have injured the plaintiff class of female NOW members ..." Paragraph 110[11] is part of count III, alleged under RICO section 1962(c), and incorporates the injuries in paragraph 105. Count III was also stated to have been brought by "plaintiffs DWHO and Summit and the class of clinics they represent ..." (Second Am.Compl. ¶ 106). Although the section 1962(a) claims in count II were not reinstated, count III (the section 1962(c) claim) was reinstated. By asserting that NOW and its members have been injured by violation of section 1962(c), NOW asserted status as a RICO plaintiff. Although not specifically stating that it brought RICO claims in paragraphs 106 and 111, NOW did plead specific facts and injury sufficient to state a claim for relief under both sections 1962(c) and (d) because it alleged the conduct that violated the statute and that NOW was injured by that conduct. *See Luckett v. Rent–A–Center, Inc.*, 53 F.3d 871 (7th Cir.1995); *La Porte County Republican Central Comm. et. al. v. Bd. of Comm'rs of*

---

9. Paragraph twenty-two provides:
 Plaintiff NOW brings this action on behalf of itself, its women members who use or may use the services of women's health centers that perform abortions, and all other women who use or may use the services of such health centers. NOW's women members who use or may use the services of women's health centers that perform abortions have standing in their own right, the interest NOW seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual NOW members in the lawsuit. Furthermore, there is a close relationship between the interests of NOW and the interests of other women who are not NOW members who use or may use the services of women's health centers that perform abortions, and the ability of such women to represent themselves is limited. Finally, in the case of both the class of NOW's women members who use or may use the services of women's health centers that perform abortions and the class of women who are not NOW members but who use or may use the services of such health centers, the class is so numerous that joinder of all of its members is impracticable; there are numerous questions of law and fact common to the class; NOW will fairly and adequately protect the interests of the class; and the defendants have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

10. Paragraph 105 states:
 Specifically, the RICO Defendants' activities have decreased the business of, and/or increased the cost of doing business at DWHO, Summit, and similarly-situated clinics. The RICO Defendants' activities have injured the plaintiff class of female NOW members and other women who have been unable to obtain abortion services, or whose choice of clinics that provide these services has been restricted, by depriving them of the rights to choose freely between abortion providers in an unthreatened marketplace and to reap the economic and medical advantages of having that choice. WHEREFORE, plaintiffs ask that this Court certify this case as a plaintiffs' class action; award plaintiffs DWHO and Summit treble damages, to be proved at trial, along with costs, attorneys' fees, and grant all other relief to which plaintiffs may be entitled.

11. Paragraph 110 provides:
 As a result of each defendant's violation of 18 U.S.C. Section 1968(c) [sic], plaintiffs have suffered the injuries described *supra* in paragraphs 104–105. WHEREFORE, plaintiffs ask that this Court certify this case as a plaintiffs' class action, award plaintiffs DWHO and Summit treble damages, to be proved at trial, along with costs, attorneys' fees, and grant all other relief to which plaintiffs may be entitled.

*County of La Porte,* 43 F.3d 1126 (7th Cir. 1994); *Mid America Title Co. v. Kirk,* 991 F.2d 417, 422 (7th Cir.1993); *Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073, 1078 (7th Cir.1992). NOW did all that is required to state a claim under RICO section 1962(c) and (d) in the Second Amended Complaint; it stated that it had been injured because of the defendants' actions that violated RICO.[12] Therefore, NOW is not barred from making RICO allegations in the Third Amended Complaint because it made the same allegations, albeit less elaborately and eloquently, in the Second Amended Complaint. This interpretation gives a reasonable interpretation to both the allegations contained in paragraph 94 and 106 (which are alleged by DWHO and Summit) as well as paragraphs 105 and 110 (which include NOW as an injured party, and therefore as a party making a claim under the count). *See* Restatement (Second) Contracts § 203(a) (year) ("an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). NOW was a RICO plaintiff in the Second Amended Complaint, and it will be allowed to continue in that vein in the Third Amended Complaint.

## 2. Wojnar's Res Judicata Argument Against All Plaintiffs

■ Defendant Conrad Wojnar argues that res judicata operates to bar all Plaintiffs from bringing RICO claims against him. Wojnar claims that in the Second Amended Complaint he was charged only with violations of the Sherman Act antitrust count (count I) and under pendent state law. Because the dismissal of the Sherman Act claims was left undisturbed, Wojnar concludes that res judicata bars the prosecution of the Third Amended Complaint's RICO allegations, as to him.

Plaintiffs argue that because the preclusive effect of res judicata is only available where a final judgment has been entered, *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979),

the doctrine is not available to Wojnar because the dismissal was reversed. Furthermore, the Plaintiffs argue that because the Wojnar was a defendant as to a state law claim under the Second Amended Complaint, Wojnar has not suffered a final dismissal and therefore no final judgment has been issued against him.

The court will analyze Wojnar's res judicata argument using the standard set forth above of identity of parties, identity of causes of action, and finality of judgment. *Car Carriers,* 789 F.2d at 595 n. 9; *Alexander,* 773 F.2d at 854; *Lee v. City of Peoria,* 685 F.2d 196, 199 (7th Cir.1982).

### a. Identity of the Parties

The first prong in the analysis of whether res judicata applies is whether the parties in the first and second actions are identical. *Car Carriers,* 789 F.2d at 595 n. 9; *Alexander,* 773 F.2d at 854; *Lee v. City of Peoria,* 685 F.2d 196, 199 (7th Cir.1982). The identity of the parties is not in dispute; the parties are identical for the purposes of this motion.

### b. Identity of Causes of Action

The second prong of the analysis is whether the causes of action in the first and second actions are identical, under the "same transaction" test as defined by the Seventh Circuit. *Car Carriers,* 789 F.2d at 595 n. 9; *Alexander,* 773 F.2d at 854; *Lee v. City of Peoria,* 685 F.2d 196, 199 (7th Cir.1982). If the causes of action arise out of the "same transaction," the suits are identical for purposes of res judicata. *Id.* There is no serious contention that the claims against Wojnar in the Second Amended Complaint and those in the Third Amended Complaint do not arise from the same set of operative facts.

### c. Final Judgment on the Merits

The third requirement for application of res judicata is that there have been a final judgment on the merits. It would appear that this requirement has been met, but Plaintiffs suggest otherwise. In count I of the Second Amended Complaint, Plaintiffs

---

12. The Supreme Court's statement in dicta that "only DWHO and SWHO [Summit], and not NOW, have sued under RICO," *NOW v. Schei-* *dler,* —— U.S. at ——, 114 S.Ct. at 802, is not to the contrary.

claimed that Wojnar violated the Sherman Act. The same conduct asserted to have violated the Sherman Act is now claimed to violate RICO. The Sherman Act count of the Second Amended Complaint was dismissed by the district court. *NOW v. Scheidler*, 765 F.Supp. at 937. That dismissal was affirmed by the Court of Appeals. *NOW v. Scheidler*, 968 F.2d at 612. It is not clear whether Plaintiffs included the dismissal of the Sherman Act count in their petition for certiorari to the Supreme Court, but it *is* clear that the Supreme Court did not grant certiorari on that issue. Thus, after the Supreme Court's decision in this case, the Court of Appeals reminded us that the Sherman Act claims were dismissed. *NOW v. Scheidler*, 25 F.3d 1053, 1994 WL 196761 *2. Thus, it would seem, there has been a final judgment for res judicata purposes. Alas, nothing in this case is that simple.

Included in the Second Amended Complaint was also count V against Wojnar alleging "tortious interference with prospective economic advantage" under state law.[13] It was alleged that the district court had supplemental jurisdiction over that and other state law counts. After the remand from the Supreme Court, the Court of Appeals stated that "counts five, six, seven, which allege violations of state law, survive as well pursuant to the district court's supplemental jurisdiction. See 28 U.S.C. § 1367." *NOW v. Scheidler*, 25 F.3d 1053, 1994 WL 196761 *2. Plaintiffs seize upon that language to argue that if the state law claims survive and this court retains jurisdiction over them, then there could not have been a final judgment on the merits for res judicata purposes. There are several things wrong with Plaintiff's position: First, the quoted statement by the Court of Appeals is dicta; second, once the order of dismissal of Count I became final, this court ceased to have jurisdiction over count V of the Second Amended Complaint; and third, Plaintiffs misconstrue the operation of res judicata in this circumstance. Count I of the Second Amended Complaint stated a claim as to which this court had federal question jurisdiction. Count V stated

a claim as to which this court had supplemental jurisdiction because of its relationship to the issues raised in count I; what was previously called "pendent claim" jurisdiction. *Finley v. United States*, 490 U.S. 545, 548, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909)). Count I was dismissed because the district court concluded that the Sherman Act was not applicable to the conduct alleged in the Second Amended Complaint. Res judicata should bar the Plaintiffs from now amending the complaint to allege a new (RICO) theory in connection with the same alleged conduct without regard to whether there remain unresolved state law claims. A brief example demonstrates why this is so. If the allegations against Wojnar contained in count V had been made in a separate state complaint rather than in the same (federal) complaint as count V, and the federal claim had been dismissed, there is no logical reason why res judicata should not bar Plaintiffs from filing a new federal complaint asserting a different (federal) legal theory as to Wojnar, but based upon the same operative facts. In the example, the existence of the state claim is irrelevant to the question of whether res judicata should apply to the federal claim.

Plaintiffs claims against Wojnar are barred by res judicata and will be dismissed.

## II. Supplemental, Ancillary, or Pendent Jurisdiction Over Vital–Med

Vital–Med alleges that its motion to dismiss should be granted because although there was a basis for federal jurisdiction under the Second Amended Complaint, there is no such basis under the Third Amended Complaint. In the Second Amended Complaint, Vital–Med was a defendant under count I (Sherman Anti–Trust Act) and count VII (breach of a duty of confidentiality allegedly owed to DWHO and Summit). Count I

---

**13.** Wojnar was named as a defendant in only counts I and V of the Second Amended Complaint.

was dismissed by the district court, affirmed by the Court of Appeals, and not considered by the Supreme Court. The Third Amended Complaint names Vital–Med as a defendant only in count V alleging a breach of a duty of confidentiality owed to DWHO and Summit. Vital–Med contends this court should dismiss count V of the Third Amended complaint because there is no federal question or diversity jurisdiction, and the court has no basis for exercising supplemental, pendent, or ancillary jurisdiction pursuant to 28 U.S.C. § 1367(a) ("Section 1367"). Plaintiffs contend that this court has supplemental jurisdiction over Vital–Med because federal jurisdiction was never lacking, and therefore the pendent state law claim under which Vital–Med is sued in the Third Amended Complaint is proper pursuant to 28 U.S.C. § 1367. Vital–Med contends that section 1367 does not apply to this case because it was commenced before the statute's effective date.

As the only claim against Vital–Med is stated under state law, it is clear that claim is not supplemental to any federal claim. *Cf.* 28 U.S.C. § 1367(a).

### A. Applicability of 28 U.S.C. § 1367

■ By its own terms, section 1367 provides for supplemental jurisdiction in the federal courts "[and] *shall apply to civil actions commenced on or after* the date of the enactment of this Act. [Dec. 1, 1990]." 28 U.S.C. § 1367 note (1990) (emphasis added). Section 1367 provides that once a district court has original jurisdiction over one claim in any civil action, that same court may adjudicate "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

This case was originally filed on October 17, 1986. An amended complaint was filed on February 3, 1989. [Docket number 155]. The Second Amended Complaint was filed on September 25, 1989. [Docket number 236]. Vital–Med was first named as a defendant in the Second Amended Complaint, in 1989. Vital–Med contends that, for section 1367 purposes, the case against them was filed in either 1986 or 1989, and therefore the statute does not apply to them. Thus, Vital–Med maintains that the court should look to pre–1990 law to determine whether it has jurisdiction over it and count V.

The Plaintiffs disagree, relying upon the opinion of the Court of Appeals that "[c]ounts five, six, and seven, which allege violations of state law, survive . . . pursuant to the district court's supplemental jurisdiction. *See* 28 U.S.C. § 1367." *NOW v. Scheidler,* No. 91–2468, 25 F.3d 1053, 1994 WL 196761 (7th Cir. May 16, 1994). Plaintiffs argue that because the Court of Appeals relied on section 1367, at least in part, in reinstating the state law count against Vital–Med, that this court should allow the claim to survive.[14]

This case has been in existence since 1986, and Vital–Med has been a defendant since 1989. No matter which date is the date on which the action was "commenced" for purposes of section 1367, both are before December 1, 1990, which is the date after which, by its own terms, section 1367 "*shall apply to civil actions commenced* [thereafter]." Therefore, section 1367 does not apply, and the court must look to the law of supplemental jurisdiction as it existed before section 1367 was enacted.

### B. History of Supplemental Jurisdiction

In contrast to state courts, federal courts are forums of limited jurisdiction, possessing only the power to hear those cases enumerated in Article III of the United States Constitution and only to the extent authorized by Congress. U.S. Const. Art. III § 2; Friedenthal, et al., *Civil Procedure* 64 (1992). It is

---

**14.** The law of the case might come into play here, as the Seventh Circuit relied, with the intermediary signal *"see"* on section 1367. *See United States v. Mazak,* 789 F.2d 580, 581 (7th Cir.1986); *United States v. South,* 28 F.3d 619, 629 (7th Cir.1994); *Williams v. Commissioner of Internal Revenue,* 1 F.3d 502, 503 (7th Cir.1993). However, this court need not follow the letter of the Seventh Circuit's ruling and assume, without

analysis, that section 1367 applies because of the *"see"* signal. *A Uniform System of Citation* 23 (15th ed. 1991). The Court of Appeals was not relying directly on section 1367, rather, it was directing the reader's attention to the statute to show the general legal theory supporting its conclusion that the counts were to be reinstated. *See id.*

fundamental that "as regards all courts of the United States inferior to this tribunal, two things are necessary to create jurisdiction, ... [t]he Constitution must have given to the court the capacity to take it, *and an act of Congress must have supplied it* ... [t]o the extent that such action is not taken, the power lies dormant." *Finley v. United States*, 490 U.S. 545, 547, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989) (quoting *The Mayor v. Cooper*, 73 U.S. (6 Wall.) 247, 252, 18 L.Ed. 851 (1868)). Originally, this meant that federal courts could not exercise jurisdiction over non-federal claims or issues that were closely related to federal claims. However, federal judges managed to accommodate the need to exercise jurisdiction over non-federal claims, and two forms of federal jurisdiction developed, ancillary and pendent jurisdiction. Friedenthal, et al., *Civil Procedure* 64 (1992).

Originally, ancillary jurisdiction was used to allow federal courts to adjudicate claims to property where the ownership of that property was otherwise properly being litigated in federal court. *Freeman v. Howe*, 65 U.S. (24 How.) 450, 16 L.Ed. 749 (1860); 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3523 (1984). Before 28 U.S.C. § 1367 was enacted, the Federal Rules of Civil Procedure used a "transaction and occurrence" standard for compulsory counterclaims and cross-claims, thereby allowing ancillary jurisdiction over these claims. 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3523 (1984).

Pendent jurisdiction was developed by the Supreme Court in *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), when Justice Marshall declared that a federal court of original jurisdiction should have the power to decide all the questions that a case presented and the court needed to decide in order to function effectively. *Osborn*, 22 U.S. (9 Wheat.) at 823. As the doctrine matured, pendent jurisdiction was most commonly exercised when a plaintiff brought a federal question claim and sought to have a related state law claim against the same defendant adjudicated before the federal court. *See, e.g., Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79

S.Ct. 468, 3 L.Ed.2d 368 (1959) (Jones Act claim provides pendent jurisdiction for maritime claim that, by itself, could only be asserted on the admiralty side of federal court.). This was called "pendent claim" jurisdiction.

"Pendent party" jurisdiction was "jurisdiction over parties not named in any claim that is independently cognizable by the federal court." *Finley v. United States*, 490 U.S. 545, 550–51, 109 S.Ct. 2003, 2007–08, 104 L.Ed.2d 593 (1989). *Finley* expressly stated that where federal courts were asked to assert pendent party jurisdiction, "as opposed to the addition of only claims, we will not assume that the full congressional power has been congressionally authorized, and will not read jurisdictional statutes broadly." *Finley*, 490 U.S. at 549, 109 S.Ct. at 2007. Thus, pendent party jurisdiction is generally not available unless the statute expressly authorizes it. *See id.* "Pendent claim" jurisdiction, by contrast,

> exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority ...' U.S. Const. Art. III. § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'

*United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Finley*, 490 U.S. at 563–64, 109 S.Ct. at 2015 (Stevens, J., dissenting).

### 1. Application to Vital–Med

█ Plaintiffs contend that the issue before the court is whether Count V against Vital–Med is a proper pendent *claim*, while Vital–Med argues that the issue is whether the court has pendent *party* jurisdiction.

It is clear from the description of the various types of supplemental jurisdiction that existed prior to the enactment of section 1367 that any jurisdiction over plaintiffs' claim against Vital–Med depends upon an assertion of pendent *party* jurisdiction. *Finley v. United States*, 490 U.S. at 550–51, 109 S.Ct. at 2007–08; *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976)

(plaintiff was unable to bring state law claims against a completely new party although the claims arose out of the same transaction and occurrence which gave rise to the plaintiff's federal claims). Vital–Med is not a defendant under any of the federal counts in the Third Amended Complaint. Plaintiffs have not asserted that Vital–Med is diverse from the plaintiffs.

Therefore, the court will grant Vital–Med's motion to dismiss count V of the Third Amended Complaint and Vital–Med as a defendant for lack of jurisdiction.[15] *Finley v. United States,* 490 U.S. at 550–51, 109 S.Ct. at 2007–08; *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *see also Kreuzfeld A.G. et al. v. Carnehammar et al.,* 138 F.R.D. 594, 608–09 (S.D.Fla.1991) (following *Finley* and dismissing a non-diverse, non-federal claim defendant in a case brought before section 1367 was enacted).

### 2. Application to Wojnar

As stated above, any attempt to assert a new (RICO) claim against Wojnar is barred by res judicata. Therefore all that is left are the state law claims against him. These claims can only be pendent party claims and the reasoning applicable to Vital–Med are equally applicable to Wojnar. *Finley v. United States,* 490 U.S. at 550–51, 109 S.Ct. at 2007–08; *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The state law claims against Wojnar will also be dismissed. *Id.* The court now turns to the merits of the motions to dismiss for failure to state a claim.

### III. Failure to State A Claim

■ The Defendants allege various theories why the Third Amended Complaint fails to state a claim upon which relief may be granted. Defendants argue that the Complaint should be dismissed pursuant to Fed. R.Civ.P. 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted if the complaint does not state a cause of action

upon which relief may be granted. *Corcoran v. Chicago Park Dist.,* 875 F.2d 609, 611 (7th Cir.1989). The facts as alleged below are viewed in the light most favorable to the Plaintiffs for the purpose of determining the Defendants' motions to dismiss. *Dimmig v. Wahl,* 983 F.2d 86, 87 (7th Cir.1993). Unless it appears beyond doubt that Plaintiffs can prove no facts which would entitle them to relief, the Court must deny the motion. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Mid America Title Co. v. Kirk,* 991 F.2d 417, 419 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 346, 126 L.Ed.2d 310 (1993). However, the court need not strain to find inferences favorable to Plaintiffs which are not apparent on the face of the complaint. *Coates v. Illinois St. Bd. of Educ.,* 559 F.2d 445, 447 (7th Cir.1977). Similarly, the court is not required to accept legal conclusions either alleged or inferred from pleaded facts. *Nelson v. Monroe Regional Medical Ctr.,* 925 F.2d 1555, 1559 (7th Cir.1991).

The factual allegations of this case will be outlined generally. Plaintiff NOW is a nationwide, non-profit organization dedicated to "advancing and protecting the legal rights of women." (Complaint ¶ 7). DWHO is a Florida corporation with its principal place of business in Delaware. (Complaint ¶ 8). Summit is a partnership with its principal place of business in Delaware. (Complaint ¶ 9). Plaintiffs allege that all the defendants except Vital–Med [16] are involved in an "enterprise," as defined in 18 U.S.C. § 1961(4). This enterprise, called the Pro–Life Action Network ("PLAN") engages in or affects interstate commerce. According to the complaint, PLAN's common purpose is to use racketeering activity to drive out of business all clinics that provide abortion services. PLAN's activities are distinct from the pattern of racketeering activity engaged in by each defendant.

Defendants Scheidler, Terry, Scholberg, Murphy, Migliorino, Wojnar [17] and the Pro–

---

15. Vital–Med's argument regarding the inapplicability of the doctor-patient privilege to their relationship with the plaintiff clinics is therefore moot.

16. Vital–Med will be dismissed from this case pursuant to this memorandum opinion.

17. Wojnar will be dismissed from this case pursuant to this memorandum opinion.

Life Action League ("PLAL") are each persons under 18 U.S.C. § 1961(3), and are associated with PLAN by virtue of their involvement with its annual conventions as speakers and in other leadership capacities. No later than 1987, Scheidler and Terry sat on PLAN's leadership council. (Complaint ¶¶ 11–12). Migliorino has been a featured speaker at one or more PLAN conventions. (Complaint ¶ 16). Scheidler, Scholberg, Wojnar, Murphy, PLAL, and Vital–Med are residents of Illinois. (Complaint ¶¶ 11, 13, 14, 15, 17, 18). Migliorino is a Wisconsin resident. (Complaint ¶ 16). Terry and Project Life are New York residents. (Complaint ¶¶ 12, 20). Defendants PLAL, Operation Rescue ("OR") and Project Life are each persons under the RICO statute, are associated with PLAN, and participate in PLAN by being its member groups. Since 1984, Vital–Med or its predecessor has provided pathology testing and other services to DWHO, Summit, and their affiliated clinics. (Complaint ¶ 17).

PLAL's business consists of using racketeering activity to disrupt clinics that perform abortions. (Complaint ¶ 18). Scheidler has been the director of PLAL. (Complaint ¶ 11). Scholberg was the assistant director of PLAL from February, 1988 until approximately 1990. (Complaint ¶ 13). Murphy has been a paid employee of PLAL since September, 1988, and he worked as a volunteer for PLAL before that date. (Complaint ¶ 15). Terry has been the executive director of Project Life and was the national organizer of Operation Rescue. (Complaint ¶ 12).

OR's business consists of using racketeering activity to disrupt and close clinics that perform abortions. OR has, through Terry and other agents and co-conspirators, engaged in racketeering activity within this district. (Complaint ¶ 19).

Project Life has engaged in racketeering activity in this district through PLAN, Terry, and other agents and co-conspirators. (Complaint ¶ 20).

Plaintiffs allege that the Defendants committed the following predicate acts of racketeering, including acts and/or threats of: (1) extortion against clinic personnel, patients, and suppliers of goods; (2) murder of clinic personnel, including doctors and their families; (3) kidnapping of clinic personnel, including doctors and their families; and (4) arson of clinics that provide abortion services; (4) taking possession of interstate shipments of fetal remains with intent to convert the remains to their own uses; (5) obstruction of interstate commerce by extortion and/or threats to commit extortion and/or the commission or threat of physical violence to persons and property; and (6) travel in interstate commerce and the use of facilities in interstate commerce with intent to commit crimes of violence to further acts of extortion and/or arson, and/or to promote, manage, establish, or facilitate the promotion, management, establishment of extortion or arson. (Complaint ¶ 2).

## A. Proximate Cause and Standing

### 1. Standing

#### a. DWHO and Summit

▆▆ The Terry Defendants allege that DWHO and Summit lack the necessary "proximate causation" and standing to bring both 18 U.S.C. § 1962(c) ("substantive RICO") and (d) ("RICO conspiracy") charges against them.

The plaintiff clinics argue that in addition to defendants' conduct at the plaintiff clinics the Defendants' "threats and acts of nationwide violence" satisfy the requirements of standing and proximate cause for the substantive RICO and RICO conspiracy claims. Defendants maintain that Plaintiffs' allegations regarding "illegal anti-abortion activities elsewhere [at clinics other than DWHO and Summit]" are insufficient to show proximate cause.

RICO's standing provision for civil cases, 18 U.S.C. § 1964(c), provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Thus, to have standing to assert claims for either substantive RICO or RICO conspiracy

violations, a plaintiff must be injured in her "business or property" due to the violation.

The seminal case on RICO standing and proximate causation is *Holmes v. S.I.P.C.* There, the Supreme Court concluded that under § 1964(c), the plaintiff need not be *directly* injured by the defendants. Rather, common law principles of proximate cause apply. *Holmes v. S.I.P.C.*, 503 U.S. 258, 268–70, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992). The requirement that there be proximate cause bars a plaintiff from recovering where her injury flowed "merely from the misfortunes visited upon a third person by the defendant's acts." *Id.* (citing 1 J. Sutherland, *Law of Damages* 55–58 (1882)). In *Holmes,* the Supreme Court concluded that plaintiff Securities Investor Protector Corporation ("SIPC") did not have standing to sue a broker-dealer under RICO despite SIPC's claim that it had the subrogated rights of the broker-dealer's customers because the link between the alleged stock manipulation which caused the injury and losses to the nonpurchasing customers was too contingent on the broker-dealer's inability to pay the claims and was therefore too remote to be the proximate cause of the customers' injuries.

However, in this case, the Supreme Court has already noted that the Second Amended Complaint made sufficient allegations to confer standing. *NOW v. Scheidler,* —— U.S. at ——, 114 S.Ct. at 803. The plaintiff clinics alleged in the Second Amended Complaint that (1) the defendants conspired to use force to induce clinics staff and patients to stop working and obtaining services elsewhere; and (2) that the conspiracy injured the business and/or property interests of the plaintiffs. *Id.* The Court stated that in light of the limited requirement that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific allegations that are necessary to support the claim," *Id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992).), "nothing more is needed to confer standing . . . at the pleading stage." *Id.*

The following allegations are set forth as examples that show injury to the Plaintiffs and that have been connected to each of the specific defendants:

1. Attempted and actual extortion committed by Scheidler on April 11, 1986 when he threatened DWHO's clinic administrator with "reprisals" if she refused to quit her job at the clinic. (Complaint ¶ G). [This allegedly harmed DWHO because it caused the clinic to lose personnel and be forced to retrain a new administrator. It allegedly harmed NOW's members because it hampered their ability to transact business with the clinic, and may have increased the cost of obtaining DWHO's services.]

2. Attempts, conspiracies to commit and the commission of extortion and/or physical violence by Operation Rescue when it organized a "National Day of Rescue" on October 29, 1988, and blocked access to clinics in forty cities and attempted to force the clinics to close. (Complaint ¶ I(4)). [This allegedly harmed the plaintiffs because, reading the complaint in the light most favorable to the plaintiffs, the activities surrounding the National Day of Rescue was committed against both Summit and DWHO. This, in turn, caused the plaintiff clinics to lose business that day, and NOW's members to be unable to transact business with the target clinics on that day.]

3. Attempts, conspiracies to commit and the commission of extortion by Scheidler, Murphy, Migliorino, Wojnar, PLAL and "others" against DWHO and Summit by conspiring to steal, stealing, and hiding interstate shipments of fetal specimens. (Complaint ¶ J(1)). [This harmed both DWHO and Summit by interfering with their business relations with Vital–Med.]

4. Scheidler, Murphy, PLAL, and "others" threatened to disclose private information about the patients of the plaintiff clinics in connection with the theft of the fetal remains. This was done in order to interfere with the actual or prospective business relations with the plaintiff clinics. (Complaint ¶ J(2)). [The clinics argue that Defendants' actions harmed their business

relationship with potential and current patients because the patients' confidential medical information could be revealed by Defendants.]

5. Attempts and conspiracies to commit extortion by Scheidler, Murphy, Migliorino, Wojnar, PLAL, and "others" against doctors working with "clinics affiliated with DWHO and Summit" by disclosing the names of the doctors who worked at the clinics. Defendants disclosed those names to induce fear in the doctors and force them (and the clinics who employed them) to forego the economic benefits of their business relations. (Complaint ¶¶ 87(K)–87(L)). [The clinics argue that this disclosure harmed the clinics business, and NOW's ability to transact business with the clinics and the doctors practicing at those clinics.]

6. Migliorino forced Summit's new lessor to breach its lease with the clinic by threatening to disrupt and harass the other tenants if Summit were allowed to move into the building. (Complaint ¶¶ 80–81). [This harmed Summit by having to incur the expense of finding a new location and, Plaintiffs allege, increased rental costs.]

7. Migliorino, Murphy, Wojnar, and Scheidler have used the telephone and mail to intimidate and harass clinics in at least six states. (Complaint ¶ 35). [Causing harm to the target clinics (DWHO and Summit are not alleged to be targets of this activity) by violating the Hobbs Act and causing intimidation and harassment as well as increasing staff turnover, and increasing costs by requiring higher salaries to keep staff at the plaintiff clinics].

8. Terry was the executive director of Project Life and was the national organizer of Operation Rescue. Terry also served on the leadership council of PLAN and conspired with others in PLAN to close clinics through force and violence. (Complaint ¶ 12). Operation Rescue and Project Life, in turn, executed over on hundred violent blockades of clinics that performed abortions. Terry participated in these blockades. (See Complaint ¶¶ 60–66). [This harmed the target clinics by interfering with their business relationships with patients and employees. Plaintiffs also argue that the blockades force the target clinics to give up property rights. None of these blockades were alleged to have occurred at the plaintiff clinics' premises. However, the conspiracy to close clinics through violence could arguably affected the plaintiffs because they are clinics that perform abortions and are therefore in the class of clinics targeted by PLAN.]

9. Scholberg conspired with others at PLAN conferences and "mini-conferences" to close clinics through force and violence and participated in several violent clinic blockades (at several of which Scholberg was arrested), although none of the blockades were at either of the plaintiff clinics. (Complaint ¶¶ 53, 55, 58). [Plaintiffs allegedly were injured by Scholberg's participation in the planning and conspiring to close clinics through force and violence.]

Thus, the allegations under the Third Amended Complaint alleges sufficient facts to satisfy general standing requirements, which is all that is required at the pleading stage. *NOW v. Scheidler*, —— U.S. at ——, 114 S.Ct. at 803; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136 (1992); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975).

### b. NOW

■■■ NOW presents a special standing problem. The Scheidler Defendants allege that NOW lacks organizational standing to bring the claims under the Third Amended Complaint. Generally, an injured party must assert her own legal rights and interests and cannot rest her claim to relief on the legal rights or interests of third parties. *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205; *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 600 (7th Cir.1993). However, in certain circumstances, an association may have standing solely as the representative of its members. *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. at 2211; *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d at 600; *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1380 n. 3 (7th Cir.1987) (citing cases). The

landmark case for associational, or organizational, standing is *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The *Hunt* test is as follows:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. Nonetheless, the possibility of representational standing does not "eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. at 2211; *see Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The *Hunt* test was recently reaffirmed in *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), where the Court specifically noted that very often an organization will present an especially efficient vehicle for litigation from the perspective of both the litigants and the judicial system. *Brock*, 477 U.S. at 289, 106 S.Ct. at 2532. The Court continued, "[a] preexisting organization can often draw upon a preexisting reservoir of experience, research, and capital. These resources ... can often sharpen the presentation of issues appreciably—one of the primary concerns of the doctrine of standing." *Retired Chicago Police Ass'n*, 7 F.3d at 600 (citing *Brock* ); *see Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 187, 71 S.Ct. 624, 656, 95 L.Ed. 817 (1951) (Jackson, J., concurring).

 The first prong of the *Hunt* test is the ability of the members of the association to sue in their own right for the alleged injury. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441; *see Brock*, 477 U.S. at 282, 106 S.Ct. at 2529. The Scheidler Defendants maintain, without citing authority, that NOW does not meet the first prong of this test because "only those NOW members injured in their

'business or property' would have standing to sue under RICO." Plaintiffs argue, however, that "the [Third Amended] Complaint has alleged direct inference with NOW members' business and property rights sufficient to meet the first *Hunt* element. *See* ¶¶ 4, 5; *Schiffels v. Kemper Financial Services, Inc.*, 978 F.2d 344, 351 (7th Cir.1992)". (Response p. 20 n. 6).

This court has been given some guidance from the Supreme Court in its opinion reversing the dismissal of this case. *NOW v. Scheidler*, —— U.S. at ——, 114 S.Ct. at 803. The Court emphasized that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992). The Court concluded that DWHO and Summit had claimed sufficient injury to their business and/or property interests to confer standing on both of the clinics. *Id.* However, alleging injury is not enough; RICO requires the complaining party to have been "injured [in her] business and/or property interests" in order to establish standing. 18 U.S.C. § 1964(c). Mindful of Congress' broad remedial purposes in enacting RICO, courts have interpreted the phrase "business or property" to mean only commercial interests, as distinct from personal interests such as pain and emotional suffering. *See, e.g., Doe v. Roe et al.*, 958 F.2d 763 (7th Cir.1992) (value of client's sexual activity, allegedly performed for attorney to pay legal fees incurred in divorce proceeding was not "business or property" for purposes of RICO); *Rylewicz v. Beaton Svcs.*, 888 F.2d 1175, 1180 (7th Cir.1989) (the terms "business or property" are words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom); *Oscar v. University Students Co-op. Ass'n*, 965 F.2d 783 (9th Cir.1992) (personal injuries, such as diminution of enjoyment of apartment suffered by tenant as result of alleged drug racketeering in neighboring apartment, not compensable under RICO); *Van Schaick v. Church of Scientology of Cal. Inc.*, 535 F.Supp. 1125, 1137 (D.Mass.1982); *Savastano v. Thompson Medical Co.*, 640 F.Supp. 1081, 1087 (S.D.N.Y.1986).

The Supreme Court has focused this court's interpretation of the "business or property" language. The Court found standing under the Second Amended Complaint because of allegations that the Defendants "conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere." *NOW v. Scheidler,* —— U.S. at ——, 114 S.Ct. at 803.

The Third Amended Complaint alleges that NOW's members have been harmed by the Defendants' blockades, threats, and destruction because women members are unable to avail themselves of a commercial relationship; the ability to transact business with the clinics. This type of injury does indeed implicate the right to transact legal business. Moreover, this type of injury is clearly *not* the kind of injury for which courts have barred recovery under RICO—it is not a "personal" injury such as pain, suffering, or humiliation. Therefore, NOW's women members would have a right to sue in their own capacities. Thus, the first prong of the *Hunt* test is satisfied.

The second prong of the *Hunt* test is whether the interests that the organization seeks to protect or enforce are germane to the organization's purpose. *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441; *see Brock,* 477 U.S. at 282, 106 S.Ct. at 2529. NOW's organizational purpose is "advancing and protecting the legal rights of women." The Defendants contend that because NOW's purpose is not abortion-specific, it may not maintain standing to prosecute this suit. Plaintiffs maintain, however, that NOW seeks to ensure reproductive freedom, which it contends is "unquestionably germane" to NOW's organizational purpose. Plaintiffs argue, moreover, that it is not necessary that the organization's sole purpose relate to the issue being litigated. Plaintiffs are correct. *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441 (interests sought to be protected must be "germane to the organization's purpose"); *Brock,* 477 U.S. at 287, 106 S.Ct. at 2531 (same, *quoting Hunt* ). Ensuring the right to abortions is a germane interest to NOW's purpose of protecting the legal rights of women. The fact that some do not share NOW's view that ensuring access to abortion services advances and pro-

tects the legal rights of women does not diminish the existence of the right or the validity of NOW's interpretation of its goals. Since *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court has recognized a woman's right to have an abortion under certain circumstances without undue interference by the state. *See also Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Hodgson v. Minnesota,* 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990); *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990). To the extent that the Third Amended Complaint alleges that that legal right is or has been hampered or threatened by Defendants, it conforms with NOW's purpose of protecting women's rights sufficiently to meet the second prong of the *Hunt* test.

The final prong of the *Hunt* test is whether the claim asserted or the relief requested requires the participation of individual members in the lawsuit. *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441; *see Brock,* 477 U.S. at 282, 106 S.Ct. at 2529. Defendants contend that NOW cannot satisfy this prong of the test because individual members will have to participate in the suit to prove the damages that they actually suffered. Plaintiffs argue that individual members will not have to participate in the suit because NOW does not seek damages under the Third Amended Complaint, rather, it seeks injunctive relief for its members. Therefore, NOW argues, there is no need for individual participation in the suit.

NOW sues only for injunctive relief. The only potential recipients of treble damages would be DWHO, Summit, and any possible class of clinics that they might represent. Thus, there would be no need for individual NOW members to establish pecuniary loss. NOW need only show, at the pleading stage, that some members would benefit from the injunctive relief requested. *Warth v. Seldin,* 422 U.S. at 515, 95 S.Ct. at 2213 ("the remedy, if granted, will inure to the benefit of those members of the association actually injured"); *Brock,* 477 U.S. at 288, 106 S.Ct. at 2531–32; *Retired Chicago Police Ass'n v.*

*City of Chicago,* 7 F.3d at 601. It may be necessary for at least some of NOW's membership to testify as to their impediments in receiving treatment at abortion clinics; however, the limited nature of this proof will not force NOW to violate *Hunt*'s third prong. NOW has standing to sue as an association.

### 2. Requirement of Predicate Act as Proximate Cause

Defendants contend that even if there is standing and general proximate cause, Plaintiffs should not be allowed to prosecute this case because their injuries do not arise out of predicate acts under RICO. Plaintiffs contend that the injuries need not arise out of predicate acts, as long as the injuries arise out of acts in furtherance of the conspiracy.

The RICO statute prohibits persons engaged in an interstate "enterprise" from conducting that enterprise's affairs through "a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" means either any act or threat of violation of several, enumerated felonious state crimes or any act which is punishable under several enumerated federal statutes. 18 U.S.C. § 1961(1). These enumerated activities are called "predicate acts." The "pattern" requirement is satisfied if the defendant commits at least two predicate acts within a ten year period (excluding any time spent in prison). 18 U.S.C. § 1961(5).

 The circuits are split on the issue of whether a predicate act must be the proximate cause of the injury. The Seventh Circuit is in the group that does not require that the injury flow from a predicate act.[18] *Schiffels v. Kemper Financial Services, Inc.,* 978 F.2d 344 (7th Cir.1992); *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1169–70 (3d Cir.1989) (injury from overt act that fur-

thers RICO conspiracy is sufficient to confer standing, even if overt act is not a predicate act of racketeering); *see Reddy v. Litton Indus., Inc.,* 502 U.S. 921, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991) (White, J. dissenting from denial of certiorari) (noting split in the circuits). This Circuit adopted the *Shearin* approach in *Schiffels* and stated that there is no need to show the injury to the plaintiff arose out of a "predicate act" as long as it arose from an "overt act" in furtherance of a RICO conspiracy, thereby being injured "by reason of" the conspiracy. *Schiffels,* 978 F.2d at 349. Schiffels had RICO standing where she sued her employer under the theory that "the defendants [employer] conspired to violate § 1962(c) by conducting the affairs of an enterprise—the Kemper Plan—through a pattern of mail fraud. The defendants harassed and eventually fired her, she says, to further the conspiracy by keeping her from revealing the fraudulent scheme." *Schiffels,* 978 F.2d at 351. The Court noted that finding standing in this context would not open the floodgates to many potentially frivolous suits because the common law principle of proximate cause will still provide a limit on standing to sue under RICO. *Schiffels,* 978 F.2d at 350 (citing *Holmes,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).

In light of the foregoing, the plaintiffs have standing to sue for RICO conspiracy if they alleged that their injuries arose out of one or more "overt acts" in furtherance of PLAN thereby being injured "by reason of" the conspiracy. *See Schiffels,* 978 F.2d at 349. It is also unnecessary to decide which of the alleged conduct would constitute predicate acts—all that is necessary is that the conduct was done in furtherance of the enterprise. *Id.*

---

**18.** *Cf.* Cases in which RICO standing was denied are generally those in which an employee-plaintiff did not allege a sufficient nexus between the alleged predicate acts committed by the employer and her termination. *See, e.g., Reddy v. Litton Industries, Inc.,* 912 F.2d 291 (9th Cir. 1990) (plaintiff who raised RICO charges in a wrongful discharge suit lacked standing under RICO because the plaintiff was the victim of an alleged wrongful discharge and not of any predicate act under RICO); *Kramer v. Bachan Aerospace Corp.,* 912 F.2d 151 (6th Cir.1990) (plaintiff who alleged wrongful discharge after reporting the employer's scheme to ship defective products lacked standing to assert a RICO claim because the predicate acts of racketeering were not the cause of the alleged injury); *Flinders v. Datasec Corp.,* 742 F.Supp. 929 (E.D.Va.1990) (plaintiff who was terminated after threatening to expose a kickback scheme lacked standing because his termination was not an injury caused by the racketeering acts). Obviously, these cases are distinguishable based on subject matter of the dispute. However, this court need not go through that analysis because the Seventh Circuit has adopted an alternative approach.

Defendants have argued that the complaint fails to allege the existence of a RICO conspiracy under section 1962(d) with sufficient specificity. However, Fed.R.Civ.P. 8(a)(2) merely requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Each count of the complaint should contain such a statement. There are heightened pleading requirements for pleading fraud which are contained in Fed.R.Civ.P. 9, but they apply *only* to cases alleging fraud. "Rule 9(b) applies only to fraud or mistake, not to conspiracy. [A] pleading of conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a). Even so, the complaint must allege some factual basis for a finding of a conscious agreement among the defendants." *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990); *see also Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 660 F.Supp. 1362, 1372 (D.Conn.1987). The requirements for pleading a RICO conspiracy are measured by the liberal pleading requirements of Fed.R.Civ.P. 8(a). *Farberware v. Groben et al.,* 1992 WL 80722 (S.D.N.Y.1992). It is inappropriate to dismiss a complaint without allowing the plaintiffs the opportunity to discover whether, in fact, their injuries resulted from the defendants actions. The court is uncomfortably aware that this is a nine-year old case, in which some discovery has been completed. However, a Third Amended Complaint is before the court today. The age of the case does not change the liberal pleading requirements of Rule 8. As discussed above, both DWHO and Summit have pled that the defendants have conspired at PLAN meetings to (violently) close clinics that provide abor-

tion services, and deprive NOW's women members the opportunity to avail themselves of those services. That is all that is required at this time to state a claim of a RICO conspiracy.

Finally, Defendants Terry, Operation Rescue, and Project Life all contend that no specific allegations of predicate acts are made against them and that therefore they should be dismissed from this case. This argument misconstrues the concept of *conspiracy.* Terry is alleged to be a conspirator in the PLAN enterprise, and thus, although there are no allegations that he committed any substantive acts against the plaintiffs in his own right, he may still be held liable for *conspiring* with the other defendants. That satisfies proximate cause for the § 1962(d) conspiracy. Operation Rescue is a member of PLAN and is alleged to have orchestrated the "National Day of Rescue" which affected the plaintiff clinics individually and to have made "class-wide threats of force and violence against all clinics [that provide abortion services]." Operation Rescue has therefore allegedly committed predicate acts against DWHO, Summit and NOW. The status of Project Life is more difficult. Project Life is alleged to have organized "massive blockades" and "clinic invasions" which were designed to block access to the clinics to prevent patients and staff from entering or leaving the facility and to create a threatening and intimidating atmosphere and a public image of danger at the clinics— thereby violating "substantive RICO" under § 1962(c). (Complaint ¶ 59). This is alleged to violate the Hobbs Act, which is a predicate act under RICO. Project Life is alleged to have participated in many of PLAN's annual conferences.[19] Although this is not a predi-

---

**19.** The word "participate" has given this court some difficulty. Although 18 U.S.C. § 1962(c) prohibits "conduct[ing] or particip[ation] directly or indirectly, in the conduct of [a RICO] enterprise's affairs," the term is, in the linguistic sense, broad. Webster's Third New International Dictionary 1646 (1976) ("participate" means "to take part in something, usually in common with others"). However, the Supreme Court recently interpreted the phrase and concluded that "participate" requires some "element of direction." *Reves v. Ernst & Young,* ── U.S. ──, ────────, 113 S.Ct. 1163, 1169-70, 122

L.Ed.2d 525 (1993). The Supreme Court adopted the "operation and management" test established by the Eighth Circuit in *Bennett v. Berg,* 710 F.2d 1361, 1364 (en banc), *cert denied sub nom. Prudential Ins. Co. of America v. Bennett,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). *Reves,* ── U.S. at ─────, 113 S.Ct. at 1169-70. It is unnecessary (and impossible) for this court to analyze now whether any of the defendants' conduct rises to the level of "operation and management" of PLAN. Plaintiffs have pled that the defendants "participated"

cate act per se, it does connect Project with PLAN and could give rise to conspiracy liability under § 1962(d). *United States v. Kragness*, 830 F.2d 842 (8th Cir.1987) (RICO conspiracy law, like traditional conspiracy law, requires only that each defendant agree to join the conspiracy, not that he agree to commit each of the acts that would achieve the conspiracy's purpose.); *United States v. Dempsey*, 768 F.Supp. 1256 (N.D.Ill.1990) (Personal agreement to commit two predicate acts is not a prerequisite to RICO conspiracy liability); *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 567 F.Supp. 1146 (D.N.J.1983) (Congress specifically provided that a conspiracy to violate substantive RICO offenses is itself a violation intended to establish separate conspiracy offense distinct from substantive offenses.), *aff'd in part, rev'd in part*, 742 F.2d 786 (2d Cir.1984) (Defendants must knowingly agree to further the affairs of the enterprise to be liable under RICO), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Thus, all three of the Terry Defendants have been adequately bound in this complaint under either a direct predicate act or a conspiracy theory of liability under section 1962(d).

### B. Pleading Deficiencies

Defendants have alleged several pleading deficiencies in the Third Amended Complaint: (1) whether the violations of the Hobbs Act are well-pled; (2) whether a RICO conspiracy has been pled under § 1962(d); (3) whether a violation of § 1962(c) has been pled.

#### 1. Hobbs Act

On remand, the Seventh Circuit directed this court to address whether the Defendants' actions violated the Hobbs Act. *NOW v. Scheidler*, 25 F.3d 1053, 1994 WL 196761 *2. The Defendants come at this question from two different angles. First, the Terry Defendants contend that there simply are insufficient facts alleged upon which this court could grant relief because the Com-

plaint fails to allege that Defendants obtained property from the Plaintiffs. Second, the Scheidler Defendants state that the Plaintiffs' reading of the Hobbs Act is too broad based upon the basic language of the statute, and the acts alleged as violating the Act simply do not state a violation. Essentially, however, both sets of defendants make the same argument: that their actions did not violate the Hobbs Act. Plaintiffs argue that the Hobbs Act predicate acts are well-pled; that there is no need to allege that the property that they lost wound up in the Defendants' hands.

The Hobbs Act is violated by anyone who "in any way or degree obstructs, delays, or affects commerce ... by robbery or extortion or attempts or conspires to so do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to violate [this section] ..." 18 U.S.C. § 1951(a). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

■ The elements of a Hobbs Act violation are: the defendants (1) induce their victims to part with property; (2) through the use of fear; (3) with an adverse effect on interstate commerce. *United States v. Local 560 of Int'l Brotherhood of Teamsters*, 780 F.2d 267, 281 (3d Cir.1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *see* Harold Brown, *Civil RICO Practice: Causes of Action* 314 (1991); Carole Golinski, *In Protest of NOW v. Scheidler*, 46 Ala.L.Rev. 163, n. 134 and accompanying text (1994).

■ The definition of "property" under the Hobbs Act is expansive. *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 101 (2d Cir.1990). The Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce

in PLAN which this court will interpret as meaning "operate or managed" in light of *Reves*. Nothing more need be pled at this time to overcome these motions to dismiss. Nonetheless, plaintiffs are reminded that they will eventually

have to prove facts which shows each of the remaining defendants did something more than attended PLAN meetings and/or endorsed its positions.

by extortion ..." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). "In a broad sense, [property includes] any valuable right considered as a source or element of wealth, including 'a right to solicit business.'" *Town of West Hartford,* 915 F.2d at 101 (quoting *United States v. Tropiano,* 418 F.2d 1069, 1075–76 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 1262, 25 L.Ed.2d 530 (1970), and citing *Northeast Women's Center,* 868 F.2d at 1350). The property affected may be either tangible or intangible, such as the right to conduct business. *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1350 (3d Cir.1989) (citing *Local 560,* 780 F.2d 267, 281 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986), for the proposition that the Hobbs Act extends to protect intangible as well as tangible property). The right to pursue a lawful business has likewise been protected. *Louis K. Liggett Co. v. Baldridge,* 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928); *United States v. Tropiano,* 418 F.2d 1069, 1075 (2d Cir.1969).

Indeed, the Seventh Circuit noted earlier in this case that "[t]he Hobbs Act ... does not require that the Defendant profit economically from the extortion." *NOW v. Scheidler,* 968 F.2d at 630 n. 17 (citing *Town of West Hartford,* 915 F.2d at 102; *United States v. Anderson,* 716 F.2d 446 (7th Cir. 1983) (defendant kidnapped and threatened to kill doctor unless he agreed to stop performing abortions violated Hobbs Act); *United States v. Starks,* 515 F.2d 112 (3d Cir.1975)).

■■■■ Extortion under the Hobbs Act, thus, focuses on the loss to the victim. *United States v. Santoni,* 585 F.2d 667, 672 (4th Cir.1978) ("the gravamen of the offense [of extortion under the Hobbs Act] is loss to the victim," quoting *United States v. Frazier,* 560 F.2d 884, 887 (8th Cir.1977)). If Plaintiffs have alleged that they have sustained economic losses resulting from Defendants' actions, that is sufficient to withstand this motion to dismiss.[20] The plaintiff clinics allege

that the Defendants deprived them of: (1) business between patients and themselves; and (2) a business relationship with doctors and other personnel who were induced to quit because of Defendants' actions. The right to provide abortion services has specifically been included in the "property" included in the Hobbs Act protection, *Northeast Women's Center,* 868 F.2d at 1350, as has a business' goodwill and customer revenues, *United States v. Zemek,* 634 F.2d 1159, 1173 (9th Cir.1980). Plaintiffs also allege deprivation of certain tangible items which were damaged or lost in various blockades and "blitzes" of the clinics. Summit alleges it lost a business relationship with a potential landlord because of Migliorino's actions and interference. These allegations are sufficient to show that the Plaintiffs parted with property.

■■■■ Similarly, the Scheidler Defendants' contention that the "rule of lenity" restrains this court from deciding that no economic profit is required under the Hobbs Act. The Hobbs Act violations are predicate acts in a *civil* RICO action. The rule of lenity only applies to criminal actions. *United States v. Hopson,* 18 F.3d 465, 469 (7th Cir.1994) ("The rule of lenity dictates that when a statutory ambiguity cannot be resolved through standard methods of interpretation, the ambiguity should be resolved in favor of the criminal accused," citing *Chapman v. United States,* 500 U.S. 453, 462–64, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991); *United States v. Bass,* 404 U.S. 336, 347–48, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971)). Thus, the rule is of no aid to the defendants in this case.

■■■■ The court now turns to the remaining requirements to allege Hobbs Act violations. *See Local 560 of Int'l Brotherhood of Teamsters,* 780 F.2d at 281. Plaintiffs allege, and the Defendants do not contest, that they parted with this property because they feared violence would occur if they did not. Moreover, Plaintiffs allege that the Defendants, through the PLAN enterprise and in-

---

**20.** Plaintiffs' argument that the Defendants did "obtain" or seek to obtain the plaintiff clinics' patients, and the clinics' agreement not to per-

form abortions is therefore superfluous. The court need not reach this argument.

dividually, threatened and committed forceful and violent acts against them and other similarly situated clinics. Third, Plaintiffs have alleged the Plaintiffs' businesses function in interstate commerce, because some patients do not reside in the state where the clinics are located. Thus, Congress' power, and therefore the Hobbs Act, reaches the Defendants' activities. The Hobbs Act predicate acts are well-pled.

*United States v. Enmons,* 410 U.S. 396, 406 n. 16, 93 S.Ct. 1007, 1013 n. 16, 35 L.Ed.2d 379 (1973), cited by the Defendants, is not to the contrary. *Enmons* says that when labor unions strike for legitimate purposes, the Hobbs Act does not apply to those activities. The problem is, of course, that in labor strikes, the purpose is to cause or threaten economic harm to achieve the union's purposes. Similarly, here the aim was to cause economic harm to achieve the defendants' purposes. In labor law the use of this concerted activity to cause or threaten harm is specifically sanctioned by statute—here it is not. Moreover, the ultimate goal of these defendants is to interfere with the exercise of a constitutional right. This is so far removed from the circumstances of *Enmons* that any reliance upon that case by defendants is misplaced.

Finally, the Terry Defendants' contention that this well-accepted view of the Hobbs Act would encompass "virtually any unlawful activity designed to change anyone's conduct" is erroneous. The vast majority of circuits who have passed on this issue were not concerned with this issue. Moreover, the Act is not without limits. The Act specifically limits "extortion" to acts that were induced by wrongful use or threatened use of *"force, violence, or fear, or under color of official right."* 18 U.S.C. § 1951(b)(2) [emphasis added]. This distinguishes the situation in which persons agree to a peaceful boycott and picketing of a business to achieve legal objectives. Thus, Defendants' examples of chaining oneself to a redwood and blocking the entrance of an auditorium would not violate the Act unless done in a manner so as to threaten force, violence, or fear. To be sure, the use of the Hobbs Act in cases such as *Northeast Women's Center* and *Town of*

*West Hartford* may approach the limits of the Act's reach. However, Defendants are simply incorrect in asserting that allowing the Hobbs Act predicate acts stand greases a "slippery slope."

Defendants' argument that this case is analogous to sit-ins at lunch counters and Rosa Parks' civil disobedience is correct, but that argument works in Plaintiffs' favor. Indeed, many who fought segregation using civil disobedience—as well as those who used violence—*were* arrested, jailed, and otherwise punished. The court reminds the Defendants that Dr. Martin Luther King, Jr. spent many days in jail for his civil disobedience. Indeed, many of the acts of civil disobedience during the 1960's were committed to test the constitutionality of the laws that were disobeyed. Because one fights a political cause does not mean that his conduct is immunized from liability. The law applies to all citizens in this country, even those who violate the law out of conscience. Currently, the law protects clinics who perform legal procedures, including abortions. Since *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court has recognized a woman's right to have an abortion under certain circumstances without undue interference by the state. *See also Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Hodgson v. Minnesota,* 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990); *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990).

## 2. Pleading a RICO Conspiracy

RICO prohibits any person from conspiring to violate any of its subsections. 18 U.S.C. § 1962(d). The core of a RICO civil conspiracy is an agreement to commit predicate acts. Defendants claim that the Complaint does not plead a RICO conspiracy violation with adequate specificity. The Scheidler Defendants and Migliorino argue that Plaintiffs have not alleged that there was an agreement between the parties to conduct an "enterprise." Defendants also argue that the failure to allege specifics about the "agreement" of the parties should be fatal. Plaintiffs maintain that they have

alleged sufficient agreement to withstand this motion to dismiss the RICO conspiracy count.

 A RICO conspiracy claim is governed by traditional concepts of conspiracy law, and " 'should not require anything beyond that required for a conspiracy to violate any other crimes.' " *Schiffels,* 978 F.2d at 348 (7th Cir.1992) (quoting *United States v. Neapolitan,* 791 F.2d 489, 497 (7th Cir.1986), *cert. denied,* 479 U.S. 939, 940, 107 S.Ct. 421, 422, 93 L.Ed.2d 371, 372 (1986)). "Section 1962(d)'s target, like that of all provisions prohibiting conspiracies, is the agreement to violate RICO's substantive provisions, not the actual violations themselves." *Schiffels,* 978 F.2d at 348 (citations omitted). "Thus, while a conspiracy to violate RICO requires an agreement to commit a pattern of predicate acts, it does not require that any predicate acts actually be committed." *Id.* (citations omitted). Thus, a civil RICO conspiracy complaint must allege, at the very least, an agreement to commit a pattern of predicate acts or facts from which such an agreement may be inferred. *Schiffels,* 978 F.2d at 352 (may allege facts from which agreement to violate § 1962 may be inferred); *Hecht,* 897 F.2d at 25 (must allege agreement specifically); *see Rose,* 871 F.2d at 366 (conspiracy claim must contain supporting facts which describe the conspiracy's general composition, its objectives, and the defendant's general role in the conspiracy). In other words, the agreement which is alleged under section 1962(d) must be pled with at least some degree of particularity. All that is required by the Seventh Circuit at this stage is that the Plaintiffs allege (1) that each defendant agreed to conduct the affairs of an enterprise; (2) that each defendant agreed to the commission of at least two predicate acts (or to the furtherance of the enterprise through predicate acts); and (3) that each defendant knew that those predicate acts were part of a pattern of racketeering. *Schiffels,* 978 F.2d at 352; *United States v. Neapolitan,* 791 F.2d 489, 499 (7th Cir.), *cert. denied,* 479 U.S.

939, 940, 107 S.Ct. 421, 422, 93 L.Ed.2d 371, 372 (1986).

The Plaintiffs have met this burden as to all defendants except Wojnar and Project Life, who will be dismissed from this case. Plaintiffs have alleged that the other defendants (except Vital–Med) have agreed to drive all clinics who furnish abortion services out of business—in fact, that was the purpose of their organization of PLAN. The Complaint alleges that Scheidler and Terry sat on PLAN's leadership council. (Complaint ¶¶ 11–12). PLAL and Project Life **participated** [21] in the annual PLAN meetings. (Complaint ¶ 41 (PLAL only), 49 (PLAL only), 55, 58). Scholberg attended a "mini-conference" in St. Louis on December 14, 1986, as well as other PLAN meetings. (Complaint ¶¶ 53, 55). Migliorino **participated** in the PLAN convention in Chicago from August 25 to 27, 1988 and forced Summit's prospective landlord to breach the lease between the parties. (Complaint ¶ 58, 80–81). Operation Rescue was part of PLAN's project to blockade clinics in furtherance of PLAN's purpose to close abortion clinics down, and conducted several blockades in New York City, Long Island, Cherry Hill, New Jersey and Atlanta. (Complaint ¶¶ 60, 63, 64, 66). Murphy organized some of the OR blockades and assisted in the theft and storage of fetal remains from Vital–Med. (Complaint ¶¶ 65, 69, 70, 71). Murphy also **participated** in annual PLAN conventions. (Complaint ¶ 84). Scholberg, for example, attended a PLAN "mini-conference" on December 14, 1986 in St. Louis, Missouri, took part in the annual PLAN convention in Atlanta, Georgia on May 2, 1987, and was the assistant director of PLAL from February, 1988 until approximately 1990. (Compl. ¶¶ 13, 53, 54). PLAL allegedly took part in numerous PLAN conventions and **participated** in the organization and execution of several violent clinic blockades. (RICO Case Stmt. pp. 13–14).

 Thus, plaintiffs have alleged that each of the defendants except Wojnar, Project Life, and Vital–Med have participated in

---

**21.** See supra note 19 regarding what the plaintiffs must prove "participate" means in order to

state a section 1962(c).

PLAN's affairs as an enterprise, which is all that is required to plead substantive RICO. The rest of the defendants have an affiliation with PLAN and showed at least tacit agreement to "operate or manage" its affairs. The question is whether tacit agreement alone states a RICO conspiracy sufficient to withstand these motions to dismiss. Defendants have argued that this court should require proof of at least some overt act in furtherance of the conspiracy. In making this argument, defendants not only espouse the minority position, they ignore the law of this circuit. *Compare United States v. Garver*, 809 F.2d 1291 (7th Cir.1987); *United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir.), *cert. denied*, 479 U.S. 939, 940, 107 S.Ct. 421, 422, 93 L.Ed.2d 371, 372 (1986); *United States v. Angiulo*, 847 F.2d 956, 964 (1st Cir.), *cert. denied*, 488 U.S. 852, 928, 109 S.Ct. 138, 314, 102 L.Ed.2d 110, 332 (1988); *United States v. Tripp*, 782 F.2d 38, 41 (6th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1656, 90 L.Ed.2d 199 (1986); *United States v. Local 560*, 780 F.2d 267, 294–95 (3d Cir.1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *United States v. Pepe*, 747 F.2d 632, 659 (11th Cir.1984); *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1249, 1250, 75 L.Ed.2d 479 (1983); *with United States v. Schell*, 775 F.2d 559, 568 (4th Cir.1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986) (criminal RICO case in which proof of overt act in furtherance of the RICO conspiracy required); *United States v. Boldin*, 772 F.2d 719, 727 (11th Cir.1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986).

■ The Seventh Circuit has stated "[t]he substantive proscriptions of the RICO statute apply to insiders and outsiders— those merely 'associated with' an enterprise—who participate directly and indirectly in the enterprise's affairs through a pattern of racketeering activity." *United States v. Garver*, 809 F.2d 1291 (7th Cir.1987) (quoting *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir.1978)). In other words, if Plaintiffs have alleged that the Defendants committed acts in furtherance of PLAN, that is enough to show agreement to the conspiracy. Nothing more is required. The clearest form of agreement is Scheidler's and Terry's participation in PLAN's leadership council. By participating in this council, both Scheidler and Terry agreed to lead PLAN which, in turn, is alleged to be an illegal enterprise. This agreement to participate in PLAN's activities, coupled with the agreement to commit predicate acts, establishes "operation and management" and therefore potential liability against Terry and Scheidler. *See Reves*, —— U.S. at ——, 113 S.Ct. at 1169.

■ "Participation" in PLAN's annual meetings by Murphy, Migliorino, and PLAL are closer calls. However, the allegations that these parties participated in meetings are coupled with allegations of the commission of other activities in furtherance of PLAN's purpose to shut down abortion clinics. Either one of these allegations, standing alone, would be insufficient to impose liability under § 1962(d). However, taken together, the allegations show sufficient agreement to meet the first prong of the *Schiffels* analysis (that each defendant agreed to conduct the affairs of the enterprise). Thus, the first prong of the analysis is satisfied.

The second prong in the analysis is whether each defendant agreed to the commission of at least agreed two predicate acts, or at least to the furtherance of the enterprise. *Schiffels*, 978 F.2d at 352; *Frymire v. Peat, Marwick, Mitchell & Co.*, 657 F.Supp. 889 (N.D.Ill.1987); *United States v. Dempsey*, 768 F.Supp. 1256 (N.D.Ill.1990). Defendants contend that this statement of the law is insufficient. Defendants argue that they must have agreed to participate in each predicate act. This is patently wrong. All *Schiffels* requires in order for a defendant to be held liable for RICO conspiracy under § 1962(d) that he or she *agree* to the commission of at least two, but only two, predicate acts. *Schiffels*, 978 F.2d at 352. Moreover, there is some support within this circuit for an even lesser standard: that the defendants agree to conduct themselves on behalf of an enterprise. *United States v. Dempsey*, 768 F.Supp. 1256 (N.D.Ill.1990) (Personal agreement to commit two predicate acts is not a prerequisite to RICO conspiracy liability);

*Frymire v. Peat, Marwick, Mitchell & Co.,*
657 F.Supp. 889 (N.D.Ill.1987).

This does not mean that each defendant must have *committed* two predicate acts—only that each *agree* to their commission. In other words, each defendant must have agreed to the commission of two acts in furtherance of the enterprise, or, at a minimum, agreed to the furtherance of the enterprise generally. The Complaint passes this test as to all defendants except Wojnar, who has never been alleged to have attended a PLAN conference or participated in PLAN's leadership.

The final prong of this test is whether the defendants knew that the acts were committed in a pattern of racketeering, *Schiffels,* 987 F.2d at 352, with "awareness of the nature and scope of the enterprise and intended to participate in it." *United States v. Muskovsky,* 863 F.2d 1319, 1324 (7th Cir. 1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989). Plaintiffs have met their burden here as well. PLAN's essential purpose, viewed in a light most favorable to Plaintiffs, was to engage in a pattern of racketeering activity (such as blockades and theft) that was designed to inflict, and has inflicted, injury on the business and property of plaintiff clinics who provide such services. (Complaint ¶¶ 1, 41). Clearly, Scheidler and Terry, who sit on PLAN's leadership council, have sufficient understanding of PLAN's workings to know the scope of the enterprise. This knowledge may also be imparted to PLAL, who in June of 1984, is alleged to have participated in the formulation of a six-month "plan of national activities." (Complaint ¶ 37). Scholberg's awareness, viewed in light favorable to the Plaintiffs, may be inferred from his participation in PLAN's mini-conference on December 14, 1986, in which it was specifically agreed that one of their goals was to close down clinics that perform abortion. (Com-

plaint ¶¶ 53–54). OR's and Project Life's awareness, viewed in light most favorable to Plaintiffs, may be inferred from its "participation" in PLAN's annual conferences in which PLAN declared that it would try to stop abortions at clinics "by any and all means available. No abortion clinic will be spared," and where blockades were endorsed as necessary to take business away from the clinics. (Complaint ¶¶ 55, 58). Murphy's awareness of the scope of the enterprise may be inferred from his "participation" in PLAN conferences, including being a featured speaker. (Complaint ¶ 58). The court reminds the plaintiffs that it cannot conclude that simply attending one PLAN meeting would necessarily show that the defendant understood the scope of the enterprise.

Migliorino's awareness of the scope of the enterprise is tenuous. Migliorino allegedly participated in one PLAN conference on August 25–27, 1988, in which the overall goal of shutting abortion clinics down was discussed, and she was a speaker. (Compl. ¶ 17). The substantive allegations against Migliorino involve one cluster of conduct surrounding the theft of fetal remains from Vital–Med, and one cluster involving interference with Summit's future landlord. (Complaint ¶¶ 67–75, 80–81). The court concludes that these actions, taken together in a light most favorable to Plaintiffs, could show that Migliorino participated in and was aware of the scope of the enterprise, and she will not be dismissed now. It is possible that the Plaintiffs could prove some set of facts which would entitle them to relief against Migliorino under § 1962(d).

Wojnar, on the other hand, has not been named under "substantive RICO," and the only action that he is alleged to have participated in is the theft of the fetal remains. (Complaint ¶¶ 82, 67–71). This need not be addressed here, as he will be dismissed on procedural grounds.[22] All other Defendants

22. Even if Wojnar were not dismissed on procedural grounds, this court would dismiss him from this complaint based on lack of awareness of the scope of the enterprise. Facts that would imply Wojnar's awareness of the scope of the enterprise are limited. Wojnar points out in his reply that the Amended RICO Case Statement implicates him in two other actions; a May 11,

1985 clinic invasion and blockade and a November 11, 1985 clinic invasion and blockade. (RICO Case Statement p. 36). All these actions could be individual occurrences, without any input from or understanding of the PLAN enterprise. Thus, Wojnar would have been dismissed here based on lack of knowledge of the scope of PLAN. *United States v. Muskovsky,* 863 F.2d

remain under section 1962(d), with the possible First Amendment concerns of this conclusion addressed below.

### 3. Other Predicate Acts

Defendants have made various arguments about each of the predicate acts alleged in the complaint. The court will address each in turn.

#### a. Travel Act and State Law Extortion as Predicate Acts

The Terry Defendants argue that the Travel Act allegations are insufficient because the Travel Act requires that underlying acts of extortion, bribery, or arson be pled. Moreover, the Defendants maintain that extortion under the Travel Act requires that property be obtained by the perpetrator. Plaintiffs argue that no property need be received by the perpetrator; all that need be satisfied is that state extortion statute be violated. Plaintiffs maintain that the extortion laws of Alabama, Colorado, Florida, Hawaii, Indiana, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, North Dakota, Rhode Island, Tennessee, Texas, Vermont, Wisconsin, and Wyoming do not require that the defendant receive property from the victim; only that the victim to give up either a tangible or an intangible property right.[23] Plaintiffs also argue that Defendants violated these laws.

The Travel Act was primarily designed to stem the " 'clandestine flow of profits' and to be of 'material assistance' to the States in combating pernicious undertakings which cross State lines." *Nardello*, 393 U.S. at 292, 89 S.Ct. at 538 (quoting S.Rep. No. 644, 87th Cong. 1st Sess., 4 (1961)). The Travel Act reaches:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on, of any unlawful activity.

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3)....

18 U.S.C. § 1952. Unlawful activity as defined in the Travel Act includes extortion, bribery, and arson "in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(b). Unlike the Hobbs Act, the Travel Act does not define "extortion" in the statute; it leaves the definition up to individual state law. *United States v. Nardello*, 393 U.S. 286, 289 n. 3, 89 S.Ct. 534, 536 n. 3 (1969). Thus, if the violations of the underlying state law extortion statutes are well pled, so are the Travel Act violations.

At common law, "extortion" could only be committed by a public official who obtained property not due to him or his office under color of law. *Id.* Many states have expanded upon such definition to include acts committed by private individuals whereby property is obtained by force, fear, or threat. *Id.* DWHO and Summit (Delaware and Wisconsin residents, respectively) have each pled violations of their state extortion statutes. Only Delaware and Wisconsin law will be addressed because, although plaintiffs wish to maintain this as a class action, the only plaintiffs currently before the court are DWHO and Summit.

 The relevant Delaware statute provides:

A person commits extortion when, with the intent ... he compels or induced another person to deliver property to himself of to a third person by means of instilling in him a

---

1319. Wojnar's arguments regarding the sufficiency of the predicates as alleged against him will not be addressed, nor will his statute of limitations argument be considered; both of these arguments are moot as to him.

**23.** The clinics wish to maintain this suit as a class action, which could bring virtually every other state's extortion statute into play. However, because the class has not yet been certified, there is no need to address those other statutes at this time.

fear that, if the property is not so delivered, the defendant or another will:

(1) Cause physical injury to anyone; or

(2) Cause damage to property; or

(3) Engage in other conduct constituting a crime; or

(4) Accuse anyone of a crime or cause criminal charges to be instituted against him; or

(5) Expose a secret or publicize an asserted fact, whether true or false, tending to subject anyone to hatred, contempt, or ridicule; or

(6) Falsely testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

(7) Use or abuse his position as a public servant by performing some act within or related to his official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely; or

(8) Perform any other act which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation, or personal relationships.

Del.Cod.Ann. tit. 11, § 846 (1990).

Defendants allege conclusorily that this statute requires obtaining property and plaintiffs have failed to allege this element. Plaintiffs maintain that they *have* alleged that Defendants obtained property from them because Delaware's definition of property is broad enough to encompass DWHO's agreement not to enter business relationships with their patients.

Only a state court can authoritatively interpret its own state statutes and laws. *United States v. Thirty–Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971); *Waldron v. McAtee*, 723 F.2d 1348, 1352 (7th Cir.1983). Delaware apparently has not construed the definition of property in this context. The parties have cited no authority on the matter, and the court's independent research has found a similar void. In the absence of guidance from Delaware state courts, a federal court should decide the issue in a way in which it believes the highest state court would rule of the issue were presented to it. *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561, 574 (7th Cir. 1993). This is difficult here, as it requires this court, sitting in Illinois, to determine what the Delaware Supreme Court would decide. In this difficult circumstance, this court will focus on the language of the statute itself.

In its statute on theft, Delaware's definition of property is: "*anything of value except land*, and includes ... documents although the rights represented thereby have no physical location, contract, rights, choses in action...." Del.Cod.Ann. tit. 11 § 857(4) [emphasis added]. Moreover, Delaware Supreme Court *has* concluded: "[t]he offense [of extortion] is complete when the threatening statement or communication is made, or is caused to be made with the intent to extort or wrongfully gain money or other property." *Bilinski v. State*, 462 A.2d 409 (Del.1983) (quoting *Bove v. State*, 33 Del. 229, 134 A. 630 (Del.Supr.1926)).

Property is defined as "anything of value except land ... including rights that have no physical location." Del.Cod.Ann. tit. 11 § 857(4). It appears that the Delaware legislature attempted to make its theft statutes as broad as possible in order to combat crime most effectively. This court has already concluded that in the Hobbs Act context, the right to do business and conduct business relationships is protected "property." *See supra* at 1072. Using a parallel analysis here, this court concludes that Delaware intended to have its crime statute reach as broadly as possible, just as Congress intended to allow the Hobbs Act broad scope. DWHO's right to conduct business relationships with both its patients and its personnel are therefore protected by Del.Cod.Ann. tit. 11 § 846. Plaintiffs have pled that the Defendants obtained, or attempted to obtain the clinics' agreement not to enter into business relationships with patients, doctors, and personnel. Plaintiffs specifically pled that Scheidler entered DWHO, threatened clinic administrator Cathy Conner. (Complaint ¶ 46). Plaintiffs allege that on April 12, 1986, Scheidler threatened that anti-abortionists

would "get rid of" clinics such as DWHO. (Complaint ¶ 47). The Plaintiffs' allegations satisfy Delaware § 846(8), which prohibits threatening to perform acts calculated to harm DWHO's business relationships. The Delaware extortion allegations are well-pled as either attempted or actual extortion.[24] The Travel Act is violated when the underlying state's law is violated and that violation affects interstate commerce. Thus, the Travel Act allegations, as alleged by DWHO, are also well-pled.

 The same arguments are maintained by Summit regarding the Wisconsin extortion statute. The relevant Wisconsin statute prohibits individuals from:

> [V]erbally or by any written communication, maliciously threaten[ing] to accuse or accuses another of any crime or offense, or threatening or commit[ing] any injury to the person, property, business, profession, calling or trade, or the profits and income of any business, profession, calling, or trade of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do any act against the person's will or omit to do any lawful act . . .

Wisc.Stat.Ann. § 943.30 (1995).

The Terry Defendants claim that the phrase "with intent thereby to extort money or any pecuniary advantage whatever" combined with the disjunctive "or with intent to compel the person so threatened to do any act against the person's will . . ." shows that this statute was designed to address two offenses; extortion by the first clause and coercion by the second. Further, Defendants point out that only extortion, and not coercion, is a predicate RICO offense. Thus, they argue, the Wisconsin extortion statute does not reach the conduct alleged in the Complaint.

 Plaintiffs maintain that the Defendants have misconstrued the Wisconsin stat-

ute, and they cite both state and federal law in support of their position that Wisconsin does not require that property be "received." The Wisconsin Court of Appeals has held that "extortion may . . . be committed if no property or money is transferred, but the victim is coerced to do something against his or her will." *State v. Dauer*, 174 Wis.2d 418, 497 N.W.2d 766, 771 (App.1993). However, this conclusion was made in the context of distinguishing the Wisconsin extortion statute from the state robbery statute. Thus, this analysis is not as forceful as if the court had decided a case similar to this one, where the extortion/coercion distinction was at issue. However, no such a case has been cited or found. Thus, it is fair to conclude, in the absence of contrary authority, that Wisconsin does not require the receipt of property to be proven in order to establish an extortion offense.

Moreover, intangible property rights, such as choses in action, have been held to constitute "property" under Wisconsin's § 943.30. *State v. Manthey*, 169 Wis.2d 673, 487 N.W.2d 44 (App.1992), *rev. denied*, 491 N.W.2d 768 (Wis.1992) (Defendant who was prospective witness in a civil action and who threatened to have extensive memory lapses at trial unless she was paid to testify committed extortion by threatening to injure litigant's property interest in the suit). Thus, Defendant's argument that the right to conduct business relations is not recognized in Wisconsin is invalid. The Complaint's allegations that Plaintiffs were forced to give up their right to conduct business relationships state a valid claim for relief under Wisconsin law. The Travel Act allegations are likewise valid, as the underlying state law claims have been properly pled. *See United States v. Nardello*, 393 U.S. 286, 89 S.Ct. 534, 536 n. 3, 21 L.Ed.2d 487 (1969).

### b. Theft of Fetal Remains As Predicate Act

 Plaintiffs have pled violations of 18 U.S.C. § 659,[25] which prohibits theft from

---

24. To establish the commission of attempted extortion, Plaintiffs must show, inter alia, that the defendant took a substantial step toward "instilling" fear in another that he would cause "physical injury to anyone" or "damage to property," if

property other than his own were not delivered to him. *Bilinski v. State*, 462 A.2d 409 (Del. 1983); Del.Cod.Ann. tit. 11 §§ 531, 846(1), (2).

25. 18 U.S.C. § 659 provides:

interstate shipment, as predicate RICO acts. The section 659 allegations arise out of Defendants' alleged theft of fetal remains and medical information thereon from Vital-Med's facility. The Scheidler Defendants claim that these allegations do not state valid predicate RICO acts because the fetal remains were not alleged to have been valued over one hundred dollars, as required by RICO 18 U.S.C. § 1961(1). Plaintiffs argue that they have pled enough to withstand this motion to dismiss, and that they will prove at trial that the fetal remains were worth "far more" than the one hundred dollar requirement.

In order for a section 659 violation to be a predicate act under section 1961(1), the act must be felonious. Under section 659, a defendant may only be convicted of a felony if the value of the property in question is at least one hundred dollars. *United States v. Brookins,* 52 F.3d 615, 619 (7th Cir.1995). "Value" is defined in section 659 as "face par or market value, whichever is greater." *Id.* (quoting *United States v. Ditata,* 469 F.2d 1270, 1273 n. 3 (7th Cir.1972). Market value, in turn, is "the price a willing buyer will pay a willing seller at the time and the place the property was stolen or at any time during the receipt or concealment of the property." *Id.* (quoting *United States v. Bakken,* 734 F.2d 1273, 1278 (7th Cir.1984). The *Brookins* court was concerned with the sufficiency of the evidence which showed that the defendant was guilty of stealing a camera. Evidence was admitted showing that the undercover agent who arrested the defendant had been offered the camera for $350, to which the agent eventually agreed. *Brookins,* 52 F.3d at 617–18. The court concluded that this evidence was "more than sufficient" to establish the value of the camera over one hundred dollars. *Id.* at 619–20.

This case has a different procedural posture. Instead of reviewing a trial court's conclusion of the value of the property, this challenge comes in the form of a motion to dismiss. This court concludes that the Plaintiffs should have the opportunity to show that the fetal remains and the accompanying medical information were worth more than $100. It would be premature to dismiss the section 659 allegations without allowing Plaintiffs such an opportunity.

That being said, this court emphasizes the test set forth in *Brookins* will guide the evaluation of the evidence of the value of the property. However, in light of the lenient pleading requirements of the Federal Rules of Civil Procedure, the court will not dismiss the section 659 violations at this time. The Defendants are on notice of what dates, times, and actions support the Section 659 claim; that is all that is required of the Complaint at this juncture.

## C. Availability of Injunctive Relief

The Plaintiffs have sued under 18 U.S.C. § 1964(c), which provides standing for private plaintiffs to enforce RICO. The subsection provides that any civil plaintiff "shall recover" treble damages and a reasonable attorney's fee. The Scheidler Defendants contend that this narrow statement of available relief precludes the Plaintiffs from suing to obtain equitable relief. Plaintiffs contend that they are entitled to seek injunctive relief, and, moreover, even if it is not so entitled, the form of relief to be obtained is "not a Rule 12(b)(6) issue."

Although Plaintiffs may be correct that, generally speaking, the form of relief is not an issue upon which a court could base a dismissal, this case raises peculiar issues in a unique posture. *See Doe v. U.S. Dept. of Justice,* 753 F.2d 1092, 1104 (D.C.Cir.1985) (court cannot dismiss a claim as long as some relief may be granted from facts alleged on the face of the complaint, citing 5 Wright &

---

Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, stationhouse, platform or depot ... with intent to convert to his own use any goods or chattels moving as or which are a part or which constitute an interstate or foreign shipment of freight, express or other property; or

Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money baggage, goods, or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Miller, *Federal Practice and Procedure* § 1357 at 602 and n. 77 (other citations omitted)); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (court must be able to address the alleged injury with a favorable decision).

Section 1964, entitled "Civil Remedies," provides in subsection (a):

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by *issuing appropriate orders, including, but not limited to:* ordering any person to divest himself of any interest, direct or indirect, in any enterprise; *imposing reasonable restrictions on the future activities* or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

[Emphasis added]. Thus, it is clear that Congress intended to allow courts to issue injunctive relief.

Nonetheless, the circuits are divided on whether private parties may petition the court for injunctions for civil RICO violations. *Conkling v. Turner et al.*, 18 F.3d 1285, 1296 (5th Cir.1994) (declining to reach the issue, but noting the split in the circuits). Some courts have concluded that this relief is not available to private parties, *see Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088–89 (9th Cir.1986) (expressly holding injunctive relief not available to private litigants under RICO), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987); *Dan River, Inc. v. Icahn*, 701 F.2d 278, 290 (4th Cir.1983) ("substantial doubt about whether RICO grants private parties . . . a cause of action for equitable relief."); *Miller v. Affiliated Fin. Corp.*, 600 F.Supp. 987, 994 (N.D.Ill.1984) (RICO does not permit equitable remedies such as declaratory judgment

and recision), while others have concluded that private plaintiffs *may* avail themselves of equitable remedies. *Lincoln House, Inc. v. Dupre*, 903 F.2d 845 (1st Cir.1990) (declining to reach the issue, but assuming that the district court could grant equitable relief); *In re Fredeman Litigation*, 843 F.2d 821, 830 (5th Cir.1988) (holding that RICO does not authorize injunctive relief against transfer of all defendant's assets in a RICO action for treble damages, but not deciding "whether all forms of injunctive or other equitable relief are foreclosed to private plaintiffs under RICO"); *Foxboro Co. v. Arabian American Oil Co.*, 805 F.2d 34 (1st Cir.1986) (in order to obtain injunctive relief, plaintiff must show irreparable injury, substantial likelihood of success on the merits, a weighing of the equities in the plaintiff's favor, and a public benefit); *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390 (5th Cir.1986) (same); *Tri–State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir.1986) (same); *Bennett v. Berg*, 685 F.2d 1053, 1064 (8th Cir.1982) (implying that equitable relief may be available under RICO), *aff'd on reh'g*, 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Aetna Casualty & Sur. Co. v. Liebowitz*, 570 F.Supp. 908, 910–11 (E.D.N.Y.1983) (reasoning that Congress did not intend "to deprive the district court of its traditional equitable jurisdiction" to grant injunctive relief for alleged violations of RICO statute), *aff'd other grounds*, 730 F.2d 905 (2d Cir.1984), *see also* Batista, *Civil RICO Practice Manual* 169 (1987) (§ 6.13—The Availability of Injunctive Relief).

The Seventh Circuit has not yet ruled on this issue. However, in light of the Supreme Court's instruction that "RICO is to be read broadly" and that the very purpose of the statute is to "supplement and strengthen the means already available for fighting crime," *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 this court is reluctant to read the statute in a

limited way. Moreover, there is substantial authority for allowing private parties to seek equitable remedies, and even though that authority does not arise in this circuit, this court is persuaded by the rationale in those opinions. The court concludes that the Plaintiffs may seek the equitable remedies they ask for in the Third Amended Complaint. *Lincoln House*, 903 F.2d 845 (1st Cir.1990); *In re Fredeman Litigation*, 843 F.2d 821, 830 (5th Cir.1988); *Bennett v. Berg*, 685 F.2d 1053, 1064 (8th Cir.1982), *aff'd on reh'g*, 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Aetna Casualty & Sur. Co. v. Liebowitz*, 570 F.Supp. 908, 910–11 (E.D.N.Y.1983). Having concluded that the court's power encompasses the Plaintiffs' prayer for the court to "enjoin Defendants and their co-conspirators from further racketeering activity," the court notes that any potential injunction or "reasonable restrictions" imposed must pass muster under the First Amendment.

### IV. First Amendment Concerns

Just two issues remain before the court at this time; both involve claimed constitutional rights. These issues are addressed last because, although they are part of the mandate of the Seventh Circuit, courts are constrained to decide cases without reference to the federal constitution whenever possible. *Redgrave v. Boston Symphony Orchestra Inc.*, 855 F.2d 888, 911 (1st Cir.1988), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989). The first issue deals with the extent to which the First Amendment protects Defendants' actions, and the second concerns the facial constitutionality of the RICO statute.

### A. Freedom of Speech

The Seventh Circuit directed this court to address, "if necessary, . . . which of the defendants' activities, as alleged, are protected by the First Amendment to the United States Constitution." *Scheidler*, 25 F.3d 1053, 1994 WL 196761 at *2. This direction follows Justice Souter's comment in concurrence: "even in a cases where a RICO violation has been validly established, the First Amendment may limit the relief that can be granted against an organization otherwise engaging in protected expression." *Scheidler*, — U.S. at —, 114 S.Ct. at 807 (Souter, J. concurring).

The Defendants argue that the use of civil RICO is inappropriate in this context because, even if they did commit predicate acts, their actions, including the allegations of attempt, advocacy, and commission of arson, kidnapping and murder, were done in the furtherance of their political beliefs. Therefore, Defendants argue, those actions are protected by the First Amendment. Defendants focus on three paragraphs containing predicate acts under count I (RICO § 1962(c)) of the Complaint in support of their position: paragraphs 87N, 87O, and 87Q. Paragraph 87N alleges that the RICO Defendants committed a predicate act of:

**Encouraging, organizing, and inciting** the commission of arson, in violation of state arson and extortion laws, including but not limited to [1] **urging** the destruction of "bricks and mortar," and [2] **declaring** that arson is not "violence"; [3] **applauding and endorsing** acts of arson by co-conspirators'; [4] **encouraging, inciting and inducing** acts of arson through letters, speeches, films, various writings, and other media; [5] **urging** followers to act as if violence were permissible if it were to stop abortions; [6] **praising** the depiction of co-conspirators in front of clinics destroyed by arson; [7] **teaching** followers (including highly susceptible and vulnerable individuals) that arson is trivial and is justified if it prevents an abortion; [8] **encouraging** those who have committed arson to keep up their work **and assisting** them in doing so; [9] **ridiculing** those who reject force and violence as a method to express their opposition to abortion, including but not limited to calling them "wimps," "wimps-for-life" and similar expressions; and [10] **encouraging** followers to emulate those who have been convicted of arson on repeated occasions. [Numbers and emphasis added].

Paragraph 87O alleges that the RICO Defendants "attempt[ed] and conspir[ed] to kidnap . . . **by encouraging, organizing, and inciting** the kidnapping of doctors who perform

abortion ... [emphasis added]" Paragraph 87Q alleges that the RICO Defendants attempted to commit murder **"by encouraging and inciting** members of the enterprise to commit murder. [emphasis added]" Although the Defendants do not cite other paragraphs of the complaint which may run afoul of the First Amendment, there are others which the court, in an independent analysis, believes call the First Amendment into question. These paragraphs[26] and the allegations contained therein will also be addressed because the Seventh Circuit has mandated that this be done.

Plaintiffs argue that they treasure the First Amendment and its protections as much as the Defendants, but that Defendants' acts are not immunized simply because they were committed with a political goal. Plaintiffs contend that the actions alleged in the complaint go beyond the protections of free speech and move into unprotected, violent action and/or unconstitutionally protected "incitement" speech.[27] Plaintiffs argue that to the extent that free speech issues are implicated by the Complaint, they may be adequately addressed by giving a proper jury instruction at the time of trial. (Response p. 4 n. 6). Plaintiffs also argue that the Defendants' speech and actions have created a "context of violence" which causes them to fear for their safety if they were to pursue their rights as clinics to operate. Because the speech and actions created this "context," Plaintiffs argue, both the speech and the acts run afoul of the First Amendment and should be enjoined.

Central to the concept of civil liberties in this society is the idea of freedom of speech. The First Amendment provides:

> Congress shall make no law ... abridging the freedom of speech, or of the press, or the right of people peaceably to assemble, and to petition the government for a redress of grievance.

---

**26.** The paragraphs are: ¶¶ 28, 29, 30, 33, 36, 42, 45, 47, 57, 58, and 74.

**27.** Plaintiffs also make significantly broader arguments regarding the First Amendment's application to the Complaint. For example, they argue that their reference to Scheidler's book *Closed: 99 Ways to Stop Abortion* in paragraphs 29 and 30 of the Complaint is admissible to show

---

U.S. Const. amend. I. "The First Amendment is a charter for government, not an institution of learning. 'Free trade of ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *N.A.A.C.P. et al. v. Claiborne Hardware Co. et al.,* 458 U.S. 886, 102 S.Ct. 3409, 3423, 73 L.Ed.2d 1215 (1982) (quoting *Thomas v. Collins,* 323 U.S. 516, 537, 65 S.Ct. 315, 325, 89 L.Ed. 430 (1945)). Further, as Justice Brandeis aptly stated in his concurrence in *Whitney v. California,* 274 U.S. 357, 375, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J. joined by Holmes, J., concurring), *overruled other grounds, Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), freedom of conscience is essential to the "discovery and spread of political truth," to "stable government," and to "political change." Courts must therefore be extremely cautious of interpreting this important right in a limiting fashion. A key difficulty in freedom of speech litigation, and the critical problem in this case, is defining "speech" distinct from the actions surrounding it and from the actions the speech may, in turn, produce. *See* Lawrence Tribe, *American Constitutional Law* 788 (2d Ed.1988).

The essential issue in this analysis is whether the words used by the Defendants fall into the "fighting words" exception to First Amendment protection. If the speech that Defendants engaged in falls within this exception, this court has authority to enjoin similar future speech. *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) is the current state of the law regarding "subversive advocacy," or "fighting words," or speech that calls for or tends to produce or incite violence. In *Brandenburg,* the Supreme Court struck down an Ohio law which was not "directed to inciting or producing *imminent* lawless action [emphasis added]" and "likely to produce such action" yet nonetheless prohibited speech. *Bran-*

---

Scheidler's intent, even though the book is clearly covered by the First Amendment's protection and cannot be argued to be a predicate act. (Response p. 2 n. 1). None of the defendants chose to raise this issue in their motions to dismiss. Nonetheless, this court must address them as mandated by the Seventh Circuit.

*denburg,* 395 U.S. at 447, 89 S.Ct. at 1829. The only way that a state may regulate speech is if the speech *does* call for immediate illegal acts which are likely to occur following the speech.

■ Thus, in order to qualify as "fighting words," the speech must (1) incite imminent illegal activity and (2) be likely to produce such activity. The freedom of speech is an essential right which is to be abridged only where "emergency . . . makes it immediately dangerous to leave the correction to time." *Abrams v. United States,* 250 U.S. 616, 630–31, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J. dissenting); *see* Tribe, *American Constitutional Law* at 844.

Some commentators have argued that the "imminence" standard requires that the time between the speech and the action be so brief that there is no opportunity for rebuttal or reflection. *See* David A.J. Richards, *Toleration and the Constitution* (1986) (Arguing that the best way to protect free speech is to allow the freedom to reach the boundaries of "equal liberty of conscience," which is the essential element of this society.) Plainly, "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Brandenburg,* 395 U.S. at 448, 89 S.Ct. at 1830 (quoting *Noto v. United States,* 367 U.S. 290, 297–98, 81 S.Ct. 1517, 1520–21, 6 L.Ed.2d 836 (1961).

■ In *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, the Court reversed a judgment which awarded damages caused by a seven-year boycott organized by the plaintiff NAACP and its members, which was imposed against defendants, who were white-owned businesses, to achieve integration. *Claiborne Hardware Co.* is factually similar to this case because both cases dealt with political protest mixed with violence. The *Claiborne Hardware Co.* boycott consisted of picketing and "disciplining" African Americans who continued to patronize white-owned stores. The "discipline" consisted of members of the NAACP, called "Black Hats" or "Deacons," who stood outside white-owned stores and identified African Americans who transacted business with them. The Deacons then published the names of the "offenders" both orally at the NAACP meetings, and in a paper called the "Black Times." The lower court also observed that four incidents which clearly involved violence occurred because the victims ignored the boycott, and noted six others that showed an "unlawful form of discipline was applied to certain boycott violators." *Claiborne,* 458 U.S. at 905, 102 S.Ct. at 3421. Half of those ten incidents were found to have occurred in 1966, but none were conclusively found to have occurred after 1966, even though the suit was brought in late 1969. The Court concluded that the "coercion, intimidation, and threats" were "part of the boycott activity" and were protected by the First Amendment. *Claiborne,* 458 U.S. at 906, 102 S.Ct. at 3423. However, and importantly, the Court expressly distinguished *Milk Wagon Drivers Union of Chicago, Local 753 et al. v. Meadowmoor Dairies, Inc.,* 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, *reh'g denied,* 312 U.S. 715, 61 S.Ct. 803, 85 L.Ed. 1145 (1941). In *Milk Wagon Drivers* the Court upheld an injunction that prohibited both violent and nonviolent picketing and protesting activity because of the violent environment and conduct surrounding the activity. The *Claiborne* court distinguished *Milk Wagon Drivers* by stating, "in this case [*Claiborne*] the Mississippi Supreme Court has relied on isolated acts of violence during a limited period to uphold respondents' recovery of all business losses sustained over a 7–year span." *Claiborne,* 458 U.S. at 924, 102 S.Ct. at 3431. Thus, the Court gave great importance to the context of the violence in which the speech/nonspeech activities rested. Where there is a context of violence over the entire time span of the suit, and that violence is of a serious nature, such as was the case in *Milk Wagon Drivers* (in which at least fifty instances of window-smashing, explosive bombings, stench bombs, destruction of trucks and stores, serious injury to drivers and storekeepers, arson, threats and the like), the Court gives greater weight to the protection of citizens and property and less to free speech concerns. The protest speech in *Milk Wagon Drivers* occurred by both words and violent actions. Indeed, that

court constructed the question as "whether a state can choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are *enmeshed* with contemporaneously violent conduct which is concededly outlawed." *Milk Wagon Drivers,* 312 U.S. at 292, 61 S.Ct. at 554. The violence which was used to protest the method of milk distribution was plainly not protected by the First Amendment, although the picketing plainly was. However, where the protest activity is relatively peaceful, with only minor breaches of the peace, it is more likely that the Court will guard free speech privileges of the protesters with greater vigilance. More importantly, when peaceful and violent activity are "enmeshed," that fact counsels in favor of regulation of the entire range of action.

Plaintiffs contend that this case is analogous to *Milk Wagon Drivers* and argue that the context in which the Defendants' speech was conducted should remove it from the protection of the First Amendment. Plaintiffs have alleged the following specific acts which provide a context of violence in which Defendants' alleged "speech" took place:

(a) Between June, 1984 and the end of 1985: forty (40) acts of arson on clinics that provide abortion (¶ 40);

(b) In March of 1986: one attempted arson (¶ 44); March 26, 1986: one occurrence of *destruction of clinic property* (¶ 43); assault and physical injury of five persons, four on March 26, 1986 and one in December of 1987 (¶¶ 57, 87D);

(c) On April 12, 1986: one occurrence of criminal trespass and harassment (¶ 48);

(d) Twelve individually cited violent blockades in which at least one of the Defendants participated and, inter alia, blocked traffic in and out of the clinics and in which confrontations with police and patients occurred and hundreds of arrests were made on April 19, 1986, November 28, 1986, November 29, 1986, April 30 through May 2, 1987 (one per day—three total), August 27, 1987, November 28, 1987, and May 2 through 5, 1988 (one per day—four total) (¶¶ 44, 49, 51, 55, 58, 62, 63, 87D, 87I(1));

(e) Beginning July 19, 1988 and continuing until December 1988, a series of Operation Rescue actions occurred in Atlanta, Georgia (¶ 64);

(f) On October 29, 1988, which was called the "National Day of Rescue" pro-life activists blockaded forty clinics across the country and in Toronto, Canada (¶ 65);

(g) Local Operation Rescue activities have continuously taken place across the country, in which more than 10,000 participants have been arrested (¶ 66);

(h) On March 10, 1993, conspiracy to commit and commission of the murder of Dr. David Gunn.

Thus, a total of over one hundred violent events have been specifically alleged within the nine-year time span covered by the Third Amended Complaint. Although these acts must be assumed to be true by this court, they do not necessarily mandate that all of Defendants' free speech rights have been forfeited. "Right to free speech in the future cannot be forfeited because of dissociated acts of past violence." *Milk Wagon Drivers,* 312 U.S. at 296, 61 S.Ct. at 556. Protected free speech, which involves words and not actions, is not implicated by the activities outlined above in (a) through (h). The Plaintiffs must allege that the protected speech, such as inciting, encouraging, and the like, is "enmeshed" in the violent acts. Specifically, Plaintiffs must allege that the Defendants' speech activity was so closely linked in time and place to the violence that the law must intervene and prohibit the provocation from occurring. They have not done so here.

Moreover, this complaint seeks not only to enjoin the Defendants from "further racketeering activity," which may or may not include speech, but it also seeks to impose civil damages for activities which clearly include speech to some degree. *See* ¶¶ 87N, 87O, 87Q (alleging predicate acts consisting of encouraging, organizing, inciting, urging, declaring, endorsing, praising, teaching, and ridiculing others to further the pro-life cause) and p. 67, *supra.* These verbs all describe *speech* and not violence in any way. The alleged speech is patently and firmly within the boundaries of freedom of expression. Those paragraphs must be stricken from the Complaint, as they do not allege predicate

acts—rather, they allege legal protest actions protected by the freedom of expression.

Moreover, the protections of the First Amendment are usually used as a shield and not as a sword. *Redgrave et al. v. Boston Symphony Orchestra, Inc.*, 602 F.Supp. 1189, 1200 (D.Mass.1985) ("The legal system stands ready to shield freedom against unlawful government intrusion, but reluctant to use the sword of damages to vindicate one claim of freedom by striking down another."), *modified*, 855 F.2d 888 (1st Cir.1988), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989). RICO was not enacted to collapse the freedom of speech; it was enacted to give federal peace officers a powerful weapon with which to fight organized crime.

The Defendants have called into question only three paragraphs, while the court has found a total of seventeen which implicate the First Amendment. As noted, the Seventh Circuit mandated that this court address the issue of the First Amendment as it relates to this action. This court is obliged to address "which of the defendants' activities, as alleged, are protected by the First Amendment," and therefore all seventeen paragraphs will be discussed.

Encouraging activity which was not immediately followed by violence is protected by the First Amendment. "Immediately" means within a period which does not give time for reflection. Although the Supreme Court has not set forth a "bright-line" interpretation of what "immediately" means in this context, this court assumes it to mean at maximum a twenty-four hour period. The Plaintiffs' attempt to analogize to the situation in *Milk Wagon Drivers* fails because the protected speech and the violent activities are insufficiently linked. Having stated the court's conclusion, the specific paragraphs of the compliant need to be addressed. Unfortunately, Plaintiffs have alleged both protected speech and unprotected lawless action in the same paragraph, so it is difficult to specifically navigate and strike [28] full paragraphs. Moreover, as noted above, it is unclear what weight several of the paragraphs are to be given because they have not been incorporated into count I, although they were incorporated into count II.

Paragraphs 29, 30, and 33[29] will be stricken in their entirety because they allege

---

**28.** To strike portions of a complaint, the allegations being challenged must be so unrelated to plaintiff's claims as to be void of merit and unworthy of any consideration. *Robinson v. The Midlane Club, Inc. et al.*, 1994 WL 577219 *2 (N.D.Ill. Oct. 19, 1994). Further, the presence of the references sought to be stricken must be prejudicial to the movant. *Pelech v. Klaff–Joss, L.P.*, 828 F.Supp. 525, 536–37 (N.D.Ill.1993) (acknowledging the seriousness implied in any poorly supported allegations, but denying motion to strike where argument at issue was not devoid of merit); *Tektel, Inc. v. Maier*, 813 F.Supp. 1331, 1334 (N.D.Ill.1992). Motions to strike are brought pursuant to Fed.R.Civ.P. 12(f) and are generally disfavored. *Robinson v. The Midlane Club, Inc et al.*, 1994 WL 577219 *2 (N.D.Ill. Oct. 19, 1994), *see, e.g., Imperial Constr. Management Corp. v. Laborers' Int'l Union, Local 96*, 818 F.Supp. 1179, 1186 (N.D.Ill.1993) (granting a motion to strike affirmative defenses because they only added clutter to the case and because they were without merit, but upholding general rule disfavoring such motions); *Tektel*, 813 F.Supp. at 1334; *Van Schouwen v. Connaught Corp.*, 782 F.Supp. 1240, 1245 (N.D.Ill.1991); 5A Charles Alan Wright, Arthur R. Miller, Federal Practice and Procedure § 1380, at 647 (1990). Nonetheless, striking portions of a complaint is appropriate when "certain references in a pleading ... not the entire paragraphs containing them should be stricken." *Id.* at 651. This court will, to the extent necessary, strike only those portions of the Complaint which are wholly void of merit and serve only to implicate validly exercised First Amendment activities.

**29.** Paragraph 29 provides:

Scheidler has distributed throughout the United States a manual, *Closed: 99 Ways to Stop Abortion*, outlining methods intended to be used to interfere with clinics such as DWHO and Summit. Scheidler's manual encourages the use of predicate acts of racketeering activity to drive clinics such as DWHO and Summit out of business.

Paragraph 30 provides:

Scheidler has traveled throughout the country training other persons to use racketeering activity, including but not limited to the methods outlined in *Closed: 99 Ways to Stop Abortion.*

Paragraph 33 provides:

Terry has traveled throughout the country encouraging, organizing, and training other persons to use racketeering activity, including blockades designed to stop ingress and egress to the clinics, to close clinics that provide abortion and this force Plaintiffs to give up property rights.

protected speech without any direct correlation with violent activity other than the "violent context" which was outlined above. This violent context, standing alone, simply cannot support the expansive restraint that Plaintiffs would impose on Defendants' freedom of speech. The phrase in paragraph 28 [30] "encouraging others to participate in" will be stricken, as it does not apparently relate to violent activity.

▆ Paragraph 36 [31] directly correlates Scheidler's conference workshop presentation and a blockade at the Women's Awareness Clinic in Fort Lauderdale, Florida. Although Plaintiffs do not specifically allege that the blockade was violent, the court cannot conclude with certainty, given the violent factual context of many of these blockades, that this blockade was completely peaceful. Thus, in this posture, the court cannot strike the allegations contained therein.

▆ Paragraph 42 [32] is closely linked in time with a violent invasion of the Ladies Center of Pensacola, Inc. and therefore will not be stricken. Paragraphs 45 and 47 [33] are likewise linked in time with Scheidler's criminal trespass and harassment occurring on April 11, 1986 at DWHO. Although these activities are not violent per se, they are criminal. However, a showing of non-violent

criminal activity alone is not enough. The freedom of speech is one of this country's most highly prized freedoms, and the Supreme Court has stated in no uncertain terms that preventing violence is the only valid reason for squelching that right. Paragraphs 45 and 47 will be stricken because the facts as alleged do not provide the factual basis to infringe the freedom of speech as required by *Milk Wagon Drivers..*

▆ Paragraph 57 [34] does not contain an allegation regarding the length of time that passed between the threats and incitation and the physical assault that occurred. In light most favorable to the Plaintiffs, the court cannot strike the paragraph.

▆ Paragraph 58 contains a direct link between speech and an unprotected violent "lock and block," and therefore will not be stricken. Paragraph 87N (see *supra* at 67) contains no non-speech allegations and therefore will be stricken in its entirety. The phrase "by encouraging, organizing, and inciting" will be stricken from paragraph 87O. The phrase "by encouraging and inciting members of the enterprise to 'treat abortion like murder,'" in the context of actual murder and attempted murder of doctors who per-

---

30. Paragraph 28 provides:

In pursuit of their goal to drive every clinic out of business, Defendants (except Vital–Med) have traveled throughout the country, and/or used interstate telephone lines and U.S. Mail services for the purposes of engaging in, and/or *encouraging others to participate in,* their enterprise, which is devoted to the commission of racketeering activity at clinics such as DWHO and Summit. [Emphasis added]

31. Paragraph 36 provides:

From May 10 to 12, 1984, the first National Pro–Life Conference, entitled "Action for Life" was held in Ft. Lauderdale, Florida. Scheidler presented a conference workshop on "Effective Confrontation: A "How–To' of Picketing, Leafletting, Sit–Ins and Blitzes." He also spoke at a "Ready for Action" rally. As part of their training, approximately 200 conference participants were taken by bus from the convention to the Women's Awareness Clinic, a Fort Lauderdale clinic that offers abortion services. They surrounded the clinic, blocking all entrances and exits.

32. Paragraph 42 provides:

On March 25, 1986, Scheidler, PLAL, and others led a workshop in Pensacola, Florida, designed to encourage local residents to join them in using racketeering activity to drive clinics that perform abortion out of business.

33. Paragraph 45 provides:

In April, 1986, Scheidler traveled to Delaware to organize and train persons to use his methods for shutting down clinics such as DWHO and to galvanize them into action.
Paragraph 47 provides:
On April 12, 1986, Scheidler threatened that anti-abortionists "will get rid of [clinics such as DWHO]. I proclaim that Delaware is going to become the first state in the union to be free of abortion activities.

34. Paragraph 57 provides:

In December 1987, after numerous threats by Scheidler that he would close a Chicago women's health center and after incitation by Scheidler to give that clinic "a hard time" and to "molest" it, co-conspirator Anthony Lesniewski physically assaulted a security guard at the American Women's Health Center by attempting to run him over with a vehicle.

form abortion" will be stricken from paragraph 87Q.

## V. Constitutionality of RICO

The final constitutional question that is at issue in this case is the facial constitutionality of RICO. The Scheidler Defendants challenge both statutes based on overbreadth and vagueness.

### A. Vagueness

■ The Scheidler Defendants' vagueness argument points briefly to four aspects of RICO which could be the seed for this court to find that the statute is void for vagueness: (1) defining the "pattern;" (2) the scope of the "enterprise;" (3) applying the conspiracy crime to the enterprise; and (4) the impossibility of determining the "precise mental state that must be proved" in being liable for agreeing to engage in the enterprise. Amazingly, the Scheidler Defendants do no more than set forth these areas of difficulty without citing a single case in support of their position. Nor do they expand their accusations beyond pointing to the "fuzziness of [RICO's] contours of coverage about their [sic] outer fringes, [and] the vagueness of its provisions." Scheidler's Memo in Support at 15.

Although Justice Scalia invited facial challenges to RICO based on vagueness in *H.J. Inc. v. Northwestern Bell,* 492 U.S. 229, 253–56, 109 S.Ct. 2893, 2908–09, 106 L.Ed.2d 195 (1989) (Scalia, J. concurring), the statute has been consistently upheld, despite a shower of challenges. *See, e.g., United States v. Sanders,* 962 F.2d 660, 678 (7th Cir.1992); *United States v. Masters,* 924 F.2d 1362, 1367 (7th Cir.1991), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991); *United States v. Andrews,* 749 F.Supp. 1517, 1519 (N.D.Ill.1990) (Aspen, J.). More importantly, the Seventh Circuit has reaffirmed RICO's constitutionality "despite Justice Scalia's statements concerning the pattern requirements in his concurrence in *H.J. Inc.*" *United States v. Ashman,* 979 F.2d 469, 487 (7th Cir.1992) (citing cases).

In light of this overwhelming precedent, the only basis upon which this court could sustain a vagueness attack on the statute would be to read the Supreme Court's conclusion in this case that there is no economic motive requirement for RICO. The parties have made no such argument as somehow changing the analysis to be applied in evaluating constitutionality. Under the decided cases, there is no logical argument that might implicate *vagueness* (as opposed to overbreadth) in light of the lack of economic motive requirement. Thus, this court will follow *Ashman* and conclude that RICO is not unconstitutionally vague. Moreover, the Defendants have not outlined even the roughest thumbnail sketch of how the other three "seeds" could implicate a vagueness argument—not even a single law review article is cited supporting their position generally. Defendants apparently assume that this court will not only consider their argument, it will construct it as well. The court declines the invitation.

### B. Overbreadth

■ The overbreadth challenge is more substantial. The overbreadth doctrine recognizes the "governmental purpose to control or prevent activities subject [to] regulation" while acknowledging that goal "may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). An overbreadth challenge questions the statute facially because, given a reasonable interpretation of the scope of the statute, the statute reaches potentially protected speech. The analysis to be engaged in is "whether Congress has adopted a constitutional means in achieving its concededly legitimate [goal]." *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (Warren, C.J.).

■ An overbreadth challenge may be brought based on a party's belief that the statute is unconstitutional as enforced against it, but also on the ground that the statute's application to third persons not before the court violates the First Amendment. *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 798–99 & n. 17, 104 S.Ct. 2118, 2125 & n. 17, 80 L.Ed.2d 772 (1984); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973);

*Adult Video Ass'n et al. v. Barr,* 960 F.2d 781, 787 (9th Cir.1992). For the Plaintiffs to prevail, there is no need for them to argue that the statute is unconstitutional *in this case.* Rather, the court invalidates the entire statute "on its face," so that the overbroad law becomes unenforceable until a property authorized court construes it more narrowly. Gerald Gunther, *Constitutional Law* 1191 (12th Ed.1991), *see Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). In order to strike a statute based on overbreadth, the court must find that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. at 616, 93 S.Ct. at 2918. *Broadrick* emphasized that overbreadth invalidations were generally inappropriate where the allegedly impermissible implications of the challenged statute affected "conduct" rather than "speech." *Broadrick,* 413 U.S. at 616, 93 S.Ct. at 2918. In other words, if the statute in question is largely directed toward legitimately criminal activity, and merely touches the First Amendment ever so slightly at the margin, that statute need not be stricken because the overbreadth is not "substantial."

■ The Supreme Court recently considered the possibility that the forfeiture provisions of RICO are overbroad in *Alexander v. United States,* —— U.S. ——, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). The *Alexander* defendants challenged RICO because, they argued, the forfeiture provisions are not limited solely to obscene materials and the sale of such materials. *Alexander v. United States,* —— U.S. ——, 113 S.Ct. at 2774. However, the Court recognized that this was an "unprecedented use of the overbreadth principle." *Id.* Importantly, the court stated in dicta:

But the RICO statute does not criminalize constitutionally protected speech and therefore is materially different from the statutes at issue in our overbreadth cases. *Cf., e.g., Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574–75, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987).

Petitioner's real complaint is not that the RICO statute is overbroad, but that applying RICO's forfeiture provisions to businesses dealing in expressive materials may have an improper "chilling" effect on free expression by deterring others from engaging in protected speech.

*Alexander v. United States,* —— U.S. at ——, 113 S.Ct. at 2774 [Emphasis added]. The Court concluded that the chilling effect of forfeiting protected materials is no greater than the chilling effect of a prison term, or a large fine. *Id.* Although Defendants' brief is woefully devoid of an articulation of *why* RICO is overbroad, this court will attempt to anticipate their argument so it may be addressed here.[35] This court believes that Defendants wish to make a "chilling" argument similar to that raised in *Alexander* regarding freedom of association. Defendants argue that allowing RICO to be used in this context threatens "others engaged in a variety of First Amendment activity." This court interprets that statement to mean that the freedom to associate with groups who engage in protected free speech activity as well as illegal acts is "chilled" by the threat of RICO prosecution. However, Defendants miss the point of *Alexander* 's dicta quoted above: there will be no threat of prosecution if there is no illegal activity committed on the part of the individual defendant. RICO, standing alone, does not criminalize or chill speech, period. Speech is not implicated by the statute one iota. To be sure, if the individual defendant engages in illegal activity in fur-

---

**35.** It seems clear that Defendants do not care how this court decides on these constitutional issues, given the lack of attention they gave their briefing of them. Defendants simply want this court to rule so they may reach the Court of Appeals and the Supreme Court on these issues. This court assumes that the Defendants will brief the issues with greater attention to detail at higher levels. However, the Defendants are reminded that they may appeal only those issues which were properly decided by this court; they may not raise new arguments at the appellate level that were not raised here. *U.S. Equal Employment Opportunity Comm'n v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1282 n. 11 (7th Cir.1995) (citing *Citizens Ins. Co. v. Barton,* 39 F.3d 826, 828 (7th Cir.1994)). Defendants have done themselves a great disservice by not adequately briefing these issues because they will be bound on what they may appeal by what this court decides.

therance of the purpose of the organization, that activity is in no way immunized by either the fact that the defendant also spoke out in support of his cause, nor by the fact that the defendant is a member of an organization who supports, encourages, or advocates the illegal activity. As noted above, support, encouragement, and even "incitement" is not criminal unless the illegal activity so closely follows the speech in question that the speaker may be thought of as the "cause" of the illegality. But RICO itself has nothing to do with that conclusion. RICO is not overbroad.

 Finally, this court declines to address Defendant's argument that RICO is unconstitutional because it does not require a showing of "specific intent" to violate the statute. Specific intent is required to show a violation of a criminal statute. *Scales v. United States,* 367 U.S. 203, 221 n. 11, 81 S.Ct. 1469, 1482 n. 11, 6 L.Ed.2d 782 (1961). Although RICO may be used criminally, this is a civil case. As such, the issue of specific intent is not relevant. Defendants, in their brief, attempt to confuse the issue by blending in the overbreadth analysis with their argument regarding specific intent. However, overbreadth analysis, and its accompanying relaxation of the standing requirement, is unique to First Amendment issues. There is no such relaxation of the standing requirement for consideration of other constitutional challenges. Defendants do not have standing to challenge the absence of a "mens rea" requirement here. *Scales, Alexander.*

## VI. Conclusion

For the reasons stated in this memorandum opinion, IT IS HEREBY ORDERED THAT:

1. Defendant Conrad Wojnar is DISMISSED from this action;

2. Defendant Vital–Med is DISMISSED from this action;

3. Paragraphs 29, 30, 33, 45, 47, and 87N of the Third Amended Complaint are STRICKEN;

4. The phrase "encouraging others to participate in" is STRICKEN from paragraph 28; the phrase "by encouraging, organizing, and inciting" is STRICKEN

from paragraph 87O; the phrase "by encouraging and inciting members of the enterprise to 'treat abortion like murder,'" in the context of actual murder and attempted murder of doctors who perform abortion" is STRICKEN from paragraph 87Q.

The court also concludes that RICO is facially constitutional as analyzed under both vagueness and overbreadth standards.